ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
STEPHEN I. GOORVITCH (California Bar #199325)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2476
    Facsimile: (213) 894-6269
    Email:    Stephen.Goorvitch@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 11-CR-199-PA |
|                 Plaintiff, | ) |
| | ) GOVERNMENT'S RESPONSE TO |
| | ) DEFENDANT'S SENTENCING |
|               v. | ) POSITION; DECLARATION OF |
| | ) STEPHEN I. GOORVITCH AND |
| MARK ROY ANDERSON, | ) EXHIBITS THERETO |
| | ) |
|               Defendant. | ) |
| | ) Hearing Date/Time: |
| | ) |
| | ) May 21, 2012, at 8:30 a.m. |
| | ) |
| | ) |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Stephen I. Goorvitch, hereby files this response to defendant's sentencing position.  This brief is based on the attached memorandum of points and authorities, the declaration of Stephen I. Goorvitch and exhibits thereto, the government's sentencing positions and exhibits, the pre-sentence investigation report (the "PSR"), the

files and records in this case, and any argument or evidence presented at the sentencing hearing.

Dated:    May 4, 2012

                                    ANDRÉ BIROTTE JR.
                                    United States Attorney

                                    ROBERT E. DUGDALE
                                    Assistant United States Attorney
                                    Chief, Criminal Division

                                    STEPHEN I. GOORVITCH
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

2

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

I.

3

INTRODUCTION

4  Thus far, the government has filed three sentencing briefs:

5  (1) Part I concerns the PSR and the government's sentencing

6  recommendation; (2) Part II concerns certain sentencing

7  enhancements; and (3) Part III concerns total losses and

8  restitution.   The government also filed a "Brief Re: Evidentiary

9  Hearing" to alert the Court to potential issues at the sentencing

10  hearing when defendant was represented by former counsel.  Now,

11  the government files this brief in response to defendant's

12  sentencing position and to update the Court concerning the

13  government's meet-and-confer sessions with defendant's new

14  defense counsel.  In sum, the parties have <u>agreed</u> on all

15  Sentencing Guidelines calculations, except for those associated

16  with loss, though the parties are continuing to meet-and-confer

17  on this remaining issue.  The government anticipates calling only

18  one witness at the sentencing hearing.  The government also

19  amends its sentencing recommendation to 108 months in custody.[1]

20

II.

21

THE SENTENCING GUIDELINES

22  A.  <u>The Pre-Sentence Investigation Report</u>

23  The Probation Officer determined that the following

24  Sentencing Guidelines calculations apply to this case:

25

---

26  [1] Should the Court determine that a different sentencing
range applies to this case, the government would recommend that
27  the Court sentence defendant to the low-end of that range or 84
months imprisonment, whichever is greater, pursuant to Paragraph
28  3(e) of the plea agreement.  <u>See</u> Plea Agreement at ¶ 3(e).

| | | | | |
|---|---|---|---|---|
| Base Offense Level | : | 7 | [PSR at ¶ 35] |
| Losses Between $7M and $20M | : | +20 | [PSR at ¶ 36] |
| Over Ten Victims | : | +2 | [PSR at ¶ 37] |
| Violation of Texas Injunction | : | +2 | [PSR at ¶ 38] |
| Money Laundering Enhancement | : | +1 | [PSR at ¶ 40] |
| Obstruction of Justice | : | +3 | [PSR at ¶ 43] |
| Acceptance of Responsibility | : | -3 | [PSR at ¶ 45] |

B.   Sentencing Enhancements Not In Dispute

The parties have met-and-conferred on several occasions and have reached agreements on most of the sentencing enhancements. Specifically, the government agrees that the obstruction of justice enhancement under U.S.S.G. § 3C1.3 does not apply to this case for the reasons cited in defendant's brief.  Defense counsel has informed the government that defendant does not challenge the victim enhancement under U.S.S.G. § 2B1.1(b)(2) and the enhancement for violating a specific judicial order under U.S.S.G. § 2B1.1(b)(8)(C).  In his sentencing position, defendant "does not contest the legal application of the Sentencing Guidelines" with respect to the money laundering enhancement under U.S.S.G. § 2S1.1(b)(2)(A).[2]  Therefore, the government believes that the only sentencing enhancement in dispute is the loss enhancement.

---

[2] Notwithstanding that this enhancement applies under the Sentencing Guidelines, under the terms of the plea agreement, defense counsel is entitled to argue that it is predicated on the same conduct as the other enhancements and therefore does not constitute aggravating conduct.  See Defendant's Sentencing Brief at 12.

C.    The Losses That Cannot Be Disputed

Defendant concedes that the total losses are between at least $1 million and $2.5 million, resulting in a 16-level loss enhancement.  See Defendant's Sentencing Position at ¶ III.B.1. However, in his plea agreement, defendant admitted to having defrauded the Texas victims out of at least $3 million. Specifically, defendant admitted that "certain victims in this case were compensated for their losses through the approximately $3 million settlement . . . ."  Defendant's Plea Agreement at ¶ 12 (emphasis added).  Similarly, in the factual basis of his plea agreement, defendant admitted that $3 million in proceeds that he wired to his lawyers in Texas "were used to compensate certain victims in the above-entitled action."  Id. at ¶ 13 (emphasis added).[3]  Therefore, defendant cannot dispute that these losses - $3,041,966 - bring the total loss to at least $2.5 million to $7 million, resulting in at least an 18-level loss enhancement.

D.    The Losses In Dispute

Essentially, the parties are disputing whether the losses are between $2.5 million and $7 million or whether the losses are between $7 million and $20 million, which is the difference between an 18-level or a 20-level enhancement for loss.  In arguing that the losses are under $7 million, defendant challenges: (1) the losses to Bryan Williams totaling $5.425

_____

[3] Although defendant made restitution to these victims, that affects only the restitution order, and not the Sentencing Guidelines calculations.

3

 1   million, and (2) the losses to the National Healthcare victims

 2   totaling $1.76 million.  The government believes that all of

 3   these losses should count towards the loss enhancement, resulting

 4   in approximately $10.23 million in total losses.  However, the

 5   government can reach the 20-level enhancement with only Bryan

 6   Williams' losses.

                                III.

                          LOSS ENHANCEMENT

 9   A.   Legal Standard

10        The government bears the burden of proving the facts

11   underlying a sentencing enhancement by a "preponderance of the

12   evidence."  See United States v. Ameline, 409 F.3d 1073, 1085-86

13   (9th Cir. 2005)(en banc); United States v. Howard, 40 F.3d 1085,

14   1090 (9th Cir. 1990).  Defendant argues that the government must

15   prove the underlying facts by "clear and convincing evidence"

16   because an extremely disproportionate sentence would otherwise

17   result.

18        However, the cases cited by defendant do not support the

19   application of the higher "clear and convincing evidence"

20   standard in this case.  In United States v. Lynch, 437 F.3d 902

21   (9th Cir. 2006), the Ninth Circuit held that the "clear and

22   convincing evidence" standard applied because imposition of the

23   enhancement increased the sentencing range by at least 105

24   months.  See id. at 916.  By contrast, the dispute in this case

25   involves only two levels of the loss enhancement, the imposition

26   of which results in a low-end recommendation of 108 months in

27

28                                  4

1  custody versus 87 months in custody - A difference of only 21

2  months in custody.

3       Similarly, in <u>United States v. Staten</u>, 466 F.3d 708 (9th

4  Cir. 2006), the Ninth Circuit held that the 15-level sentencing

5  enhancement at issue had a disproportionate impact on the

6  sentence because it "increased [the defendant's] offense level by

7  more than four levels and more than doubled her sentence."  <u>Id.</u>

8  at 717-18.  In defendant's case, the enhancement at issue is less

9  than four levels and would not double his sentencing exposure or

10  the government's sentencing recommendation.

11      Based on the foregoing, the Court need only apply a

12  "preponderance of the evidence" standard.  Regardless, the

13  government believes that the evidence on loss would satisfy the

14  higher "clear and convincing evidence" standard.

15  B.   <u>Bryan Williams</u>

16      During his initial interview, Williams informed the FBI that

17  he was a victim.  <u>See</u> Government's Sentencing Position (Part II),

18  Goorvitch Decl., Exh. #1.  After defendant pleaded guilty,

19  Williams' attorney sent the government a letter suggesting that

20  his client may not be a victim.  <u>See</u> Defendant's Sentencing

21  Position, Harris Decl., Exh. A.  The government produced this

22  letter to defense counsel, who (understandably) argued that those

23  losses should not count towards the loss enhancement.

24      Subsequently, counsel met-and-conferred over this issue and

25  then jointly interviewed Bryan Williams in an effort to clarify

26

27

28                                    5

1  this discrepancy.[4]  During the interview on May 1, 2012, Williams

2  stated in substance the following: (1) Williams met defendant in

3  Oklahoma and looked at certain land/oil leases; (2) Defendant was

4  to purchase the land/oil leases from the owner and then sell them

5  to Anderson; (3) all of the money Williams gave Anderson was

6  intended for that purpose; (4) None of the money Williams gave

7  Anderson was intended as payment for consulting services; and

8  (5) Williams received nothing in exchange for the money he gave

9  defendant.  See Goorvitch Decl. to this Brief, Exh. #1.  Rhonita

10 Thorton corroborated Williams' account that the money was

11 intended to purchase the land/oil leases they saw in Oklahoma.

12 See Government's Sentencing Position (Part II), Goorvitch Decl.,

13 Exh. #2.  However, according to Nona Roach, defendant showed

14 Williams land/oil leases that he did not actually own and did not

15 purchase.  See id., Exh. #2 and #3.  As discussed in Part II of

16 the government's sentencing brief, defendant used the bulk of

17 this money to satisfy the civil judgments in the Texas action.

18 Therefore, all of the money Bryan Williams gave defendant counts

19 towards loss, bringing the total to over $7 million ($3,041,966

20 from the Texas victims plus $5,425,000 from Bryan Williams).

21 B.  Nationa1 Healthcare Victims

22     The National Healthcare ("NHCT") victims' losses - totaling

23 at least $1.76 million - count towards the total losses in this

24

25

26

    [4] Defense counsel has agreed that the government need not

27 call Williams as a witness at the sentencing hearing.

28                                    6

1  case.[5]  Defendant argues that the Court must offset these

2  victims' losses by the value of the stock, citing United States

3  v. Zolp, 479 F.3d 715 (9th Cir. 2007).  However, in that case,

4  the Ninth Circuit made a distinction between cases involving

5  "sham" companies whose stock has no value and legitimate

6  companies whose stock has "residual value after the fraudulent

7  scheme is revealed."  Id. at 719.  Thus, in a "pump-and-dump"

8  case,[6] district courts must "disentangle the underlying value of

9  the stock, inflation of that value due to the fraud, and either

10 inflation or deflation of that value due to unrelated causes."

11 Id.

12      Although defendant's case is not a "pump-and-dump" case, the

13 government does not challenge the underlying point that the Court

14 should determine the value of the stock and offset any

15 restitution award.  However, the government does not agree that

16 the Court should use historical trading prices as a measure of

17 the stock's value.  Not only are victims not required to take

18 steps to mitigate their losses, see United States v. Rice, 38

19 F.3d 1536, 1542 (9th Cir. 1994), the Court should not require

20 victims to have known that defendant was a fraudster and to have

21 sold their stock at one of several peaks in the market.  Rather,

22

23      [5] The losses relating to the National Healthcare victims are
   not dispositive with respect to the Sentencing Guidelines
24 calculations.  Regardless, the Court must determine these
   victims' losses for purposes of restitution.

25

26      [6] A "pump-and-dump" scheme is one in which the targets
   disseminate material misrepresentations or omissions to increase
   the value of the stock (the "pump") and then sell the stock at
27 the artificially-increased price (the "dump").

28                                    7

since the Court is now determining what restitution award to order, the relevant inquiry is the current value of the stock. Assuming that public information is complete and accurate, the market price of the stock is merely a measure of the company's value. "Shares of stock in corporations possess no intrinsic value over and above the actual value of the property of the corporation which they stand for and represent. . . ." Nevada National Bank of San Francisco v. Dodge, 119 F. 57 (9th Cir. 1902). According to the company's most recent annual report for the fiscal year ended December 31, 2011, the company - now called "Cannabis Science, Inc." - has assets of only $60,546 (including $47,588 in intangible assets) and liabilities of $2,290,947. See Goorvitch Decl. to this Brief, Exh. #4 at page 10 of 28. The company showed revenue of only $90,107 between January 27, 2005 (its inception) and December 31, 2011. See id. at page 11 of 28. However, the company showed net losses of $70,536,669. See id. Regardless of whether this evidence establishes that the company is a "sham," it certainly demonstrates that the company has no real value, which is corroborated by the stock price. Over the past year, the stock price has fluctuated from less than 1¢ per share to no more than 25¢ per share, and the market price on May 2, 2012 was 9¢ per share. See id., Exh. #5. Accordingly, the government believes that the Court should find that the NHCT

8

stock has no value and order full restitution to those victims.[7]

IV.

GOVERNMENT'S REVISED SENTENCING RECOMMENDATION

Initially, the government concurred with the PSR that the total offense level is 32. Because the government now agrees with defendant that the three-level obstruction of justice enhancement does not apply to this case, the total offense level is 29. Based on a Criminal History Category of III, the advisory sentencing range is 108 to 135 months in custody. The government is revising its recommendation to 108 months in custody. This revised recommendation is based on the reasons delineated in the government's original brief, though the government wishes to emphasize two factors that support its decision to lower its recommendation. First, the government is lowering its sentencing recommendation pursuant to the plea agreement, in order to strive for consistency and to avoid unwarranted sentencing disparities. Second, the government notes that defendant accepted responsibility and pleaded guilty sufficiently early to save the government resources, which allowed the undersigned Assistant U.S. Attorney and the case agents to work on other matters.

However, the government rejects defendant's argument that the Court should impose a sentence of 70 months in custody or less. As an initial matter, any sentence in this case should

---

[7] Ms. Vuong was defrauded out of $770,000. Even were the Court to assign some value to NHCT stock, contrary to defendant's argument, only $125,000 of this investment was for one million shares of NHCT. See Government's Sentencing Position (Part III), Goorvitch Decl., Exh. #2.

9

exceed that imposed by Judge Tashima - 84 months in custody - for

defendant's prior fraud. Also, a sentence of 70 months in

custody or less would not be stringent enough to reflect the

seriousness of defendant's offense or to afford adequate

deterrence to criminal conduct. See 18 U.S.C. §§ 3553(a)(1) and

(2)(A),(B). Therefore, the government respectfully recommends

that the Court impose a sentence of 108 months in custody.[8]

## V.

## CONCLUSION

Based on the foregoing, the government respectfully

recommends that the Court impose a sentence of 108 months

imprisonment, and a three-year period of supervised release.


Dated:    May 4, 2012

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


STEPHEN I. GOORVITCH
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[8] The government cites the aggravating factors in this case
only to support its recommendation of 108 months in custody and
to respond to defendant's request for a sentence of 70 months in
custody or less. The government is not arguing that the Court
should sentence defendant to more than 108 months in custody.
See United States v. Whitney, 673 F.3d 965, 971-72 (9th Cir.
2012). The government believes that a sentence of 108 months in
custody is necessary and sufficient to satisfy the dictates of 18
U.S.C. § 3553(a).

## DECLARATION OF STEPHEN I. GOORVITCH

I, Stephen I. Goorvitch, declare and state as follows:

1.   I am an Assistant U.S. Attorney in the Central District of California and one of the prosecutors assigned to <u>United States v. Mark Roy Anderson</u>, Case No. CR 11-199-PA.  If called to testify, I would testify to the following based on my personal knowledge.

2.   Attached are Exhibit #1 through Exhibit #3, all of which are true and correct copies (with redactions) of memoranda of interviews from the investigation and prosecution of the above-referenced case.

3.   Attached is Exhibit #4, which is a true and correct copy of the annual report for Cannabis Science, Inc. for fiscal year ended 2011, which I downloaded from the EDGAR website of the U.S. Securities and Exchange Commission on May 4, 2012.

4.   Attached is Exhibit #5, which is a true and correct copy of a print-out of trading in Cannabis Science, Inc. on May 2, 2012 from www.marketwatch.com.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 4th day of May 2012 in Los Angeles, California.


STEPHEN I. GOORVITCH
Assistant United States Attorney

# EXHIBIT #1

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___05/02/2012___

    BRYAN WILLIAMS, represented by his counsel JASON WILLIAMS and NICOLE BURDETT, was advised of the official identities of the interviewing agents, including Assistant United States Attorney STEPHEN GOORVITCH along with attorneys MARC HARRIS and AMOS ("ALEX") LOWDER, defense counsel for MARK ANDERSON.  After advising WILLIAMS of the nature and purpose of the interview, and pursuant to a signed proffer letter (attached herein), WILLIAMS provided the following information:

    WILLIAMS gave 5.4 million dollars to MARK ANDERSON for the purchase of oil leases in Oklahoma. WILLIAMS met ANDERSON in Oklahoma specifically to see the oil leases that WILLIAMS intended to purchase.  WILLIAMS observed active oil pumps on the land. WILLIAMS believed the 5.4 million dollars he gave ANDERSON was for the purchase of those Oklahoma leases. WILLIAMS gave ANDERSON the 5.4 million dollars because WILLIAMS was doing a deal with ANDERSON and WILLIAMS believed ANDERSON was in the process of purchasing the land he had seen on his Oklahoma visit.

    RHONITA THORTON was present when WILLIAMS went to Oklahoma.  WILLIAMS could not recall the name NONA ROACH, but stated that he met a few other people on his trip, whose names he could not recall.  The entire 5.4 million dollars WILLIAMS gave ANDERSON was for the purchase of land oil leases.  WILLIAMS could not recall the company Redfork Oil.

    WILLIAMS did not pay ANDERSON for consulting services and none of the 5.4 million dollars wired to ANDERSON was to pay for consulting services.  ANDERSON helped WILLIAMS set up his company, Bronald Oil, and assisted WILLIAMS with setting up his company website.  WILLIAMS set up his own company bank account.  ANDERSON and WILLIAMS spoke about the oil business and WILLIAMS was given some books and dvds to review.  Prior to WILLIAMS wiring the 5.4 million dollars, ANDERSON told WILLIAMS that he had done business in the oil industry for approximately 20 years.

    WILLIAMS did not receive anything in return for his 5.4 million dollars.  WILLIAMS did not receive the oil leases he purchased and believed this was a fraud.  ANDERSON gave WILLIAMS many excuses over several weeks and months for not providing

---

Investigation on ___05/01/2012___ at Los Angeles, California   (telephonically)

File # 318E-LA-251462                     Date dictated 05/02/2012

by  SA Allison Powojski

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MASG 044449

FD-302a (Rev. 10-6-95)

318E-LA-251462

Continuation of FD-302 of ___BRYAN WILLIAMS_____ , On _05/01/2012_ , Page __2__

WILLIAMS with the leases.  At some point, WILLIAMS realized this was a game.  WILLIAMS never had a chance to speak to ANDERSON to request his money back after finding out the deal was a just a game.

If WILLIAMS had known ANDERSON had a criminal record or that Monterey Oil Company was not a profitable oil company, WILLIAMS would not have done business with ANDERSON.

WILLIAMS does not have a good relationship with THORTON because of the falling out with ANDERSON.  WILLIAMS stated that THORTON brought him to ANDERSON.

MASG 044450

# EXHIBIT #2

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   03/11/2011

NONA ROACH, cellular phone number of ▓▓▓▓▓▓▓ and
home phone number of ▓▓▓▓▓▓, was advised of the official
identities of the interviewing agents, including Internal Revenue
Service Criminal Investigator, Special Agent MARTIN JUAREZ.  After
advising ROACH of the nature and purpose of the interview, she
voluntarily provided the following information:

ROACH works with the Bureau of Indian Affairs(BIA)that
owns the land in Osage, Oklahoma.  ROACH works for a separate
company, Agape, a small oil developer, that works with the BIA and
helps them with oil leases and assignments for property located
within Osage County.  If any entity or individual wants to purchase
land leases in Osage County, they must go through BIA.  ROACH has
worked in this industry since approximately 1997 or 1998.  Some of
ROACH's duties include preparing lease assignment paperwork, filing
the appropriate permits, and representing potential assignees at
BIA auctions and helping entities nominate leases for purchase.



ROACH learned of MARK ROY ANDERSON through RICK COOLY who
had worked with ROACH in approximately 2006 or 2007 when acquiring
oil lease assignments.  COOLY owned a company called Pemco.  COOLY
would acquire oil leases and find investors who were interested oil
assignments.  In 2008, COOLY wanted ROACH to prepare paperwork to
transfer some of COOLY's oil leases in Osage to ANDERSON.  At the
time, ANDERSON was operating under a company called Sunset Oil.
ROACH said she believed the transfer deal never went through
because in April 2008, ANDERSON re-attempted to get the transfer
from COOLY to go through BIA.

Requests for assignments are taken to the BIA.  Proper
procedure would require COOLY to pick up the assignment documents
and get them notarized before the BIA approved the transfer and
gave title to the new owner(s).   ELLEN Last Name Unknown, ▓▓▓▓
▓▓▓▓▓▓▓ at BIA, records the assignments.  ROACH did not believe
the COOLY assignment went through because all the requirements were
not fulfilled.

At one point in 2008, ANDERSON wanted to hire ROACH to
help him acquire oil leases in Osage through BIA.  ANDERSON sent
ROACH a contract using the company Freemont.  ANDERSON told her

Investigation on   03/02/2011   at  Los Angeles, California      (telephonically)

File # 318E-LA-251462                            Date dictated   03/11/2011

by   SA Allison Powojski

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

MASG 044442

FD-302a (Rev. 10-6-95)

 318E-LA-251462

Continuation of FD-302 of _____NONA ROACH_____ , On 03/02/2011 , Page __2__

that COOLY was getting the drilling permits for ANDERSON.  Once
assignment of land was approved by the BIA, the owner was required
to get drilling permits to actually excavate oil on the land.  In
order to drill, the owner needs to get approval from several
agencies including the Army Core of Engineers among others. ROACH
later found out from COOLY, that ANDERSON had committed to buying a
number of leases but never produced the earnest money or bond
(approximately $50,000) to secure the leaseholds.

ROACH stated that ANDERSON had previously acquired
approximately 29 leases from COOLY.  Each lease included 160 acres
of land in Osage.  ANDERSON had acquired these leases through his
company Sunset Oil Partners. The land was vacant and some of the
quarter sections were located in a lake.  ROACH stated that
ANDERSON did not have any oil pumps on the land and never made any
money from the land.  ANDERSON did not excavate any of his 29
leases for oil.

     STEVEN SHELLY CORNELIUS and DAVID R. COAST were selling a
combined total of approximately five quarter sections of leased
land in Osage and Roger County.  Each quarter section consisted of
approximately 160 acres.  The five quarter sections were
approximately 800 acres of land, with 320 acres located in Osage
County.  In approximately June 2008, ANDERSON told ROACH he was
looking to purchase this land from CORNELIUS and COAST and wanted
her to help facilitate the deal.

On or about Friday afternoon, July 11, 2008, ROACH met up
with ANDERSON who had arrived in Osage with RHONITA THORTON and an
unidentified white male in his mid 30's. The group went to the BIA
office to speak with ELLEN LNU in order to start the paperwork
allowing ANDERSON to nominate leases for potential purchase.

The following day, Saturday July 12, 2008, ROACH
accompanied ANDERSON on a tour of some of the oil fields in Osage.
CORNELIUS and THORTON picked up ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮BRYAN
WILLIAMS▮ and his brother (collectively "WILLIAMS brothers") who
arrived in Osage.▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ANDERSON, ROACH and CORNELIUS
drove in a separate car.  ANDERSON requested that ROACH take
everyone out to CORNELIUS' and COAST's Osage leases.  CORNELIUS'
and COAST's leases had active pump jacks on the land.  ROACH stayed
behind in the car, while ANDERSON, along with THORTON and the
WILLIAMS brothers got out and walked out to the pump jacks on the
field.  ROACH observed ANDERSON and his group taking pictures of a
hole in the ground and pointing out pump jacks to the group.



MASG 044443

FD-302a (Rev. 10-6-95)



318E-LA-251462

Continuation of FD-302 of ___NONA ROACH_____, On _03/02/2011_, Page __3__

ROACH found it odd that ANDERSON never requested that
ROACH drive the group out to the 29 leases that ANDERSON actually
owned as part of the tour.  ROACH dismissed the thought because she
believed ANDERSON and his group must have been interested in
acquiring leases from CORNELIUS and COAST.  ROACH found it peculiar
that at one point, COAST, who seemed a little tired of ANDERSON's
behavior, had removed a blacktop valve on one of his leases.  The
removal of the valve caused a noise and scared ANDERSON.  ROACH
thought it was odd that ANDERSON, who was supposedly an expert in
the oil field, would be genuinely frightened by the valve top
removal.

Following the July meeting, ANDERSON wanted ROACH to
represent him in the purchase of approximately 200-300 leases.
Specifically, ANDERSON was looking to pay $3,250 per lease.
ANDERSON already owed ROACH approximately $11,000 for her services.
ROACH wanted to be paid before she continued to help ANDERSON
acquire additional leases.  On or about July 18, 2008 ANDERSON
faxed ROACH a document showing that he had wired the $11,000 from
his Camden Holdings account to ROACH.  This document was from the
company Forte Inc. with an office address on Wilshire Blvd.  The
fax was sent from LILLY LNU from fax # ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ to ROACH at
▮▮▮ ▮▮▮▮▮▮▮▮.  ANDERSON faxed ROACH three times showing that he
had in fact transferred the money to ROACH's account.  The faxes
showed the wiring details from ANDERSON to ROACH.  ROACH received a
fax dated on or about August 20, 2008 from Finance Law Group signed
by T.A. MALONEYROACH stating the wire details for the $11,000.  The
wires never went through to ROACH's account.  ROACH filed a lien
against ANDERSON's leases for her unpaid bills.

ROACH recalled that she helped ALLEN STEVENS prepare a
lien against ANDERSON's 29 leases for money that ANDERSON owed him
for his surveying work.  The surveyor goes out to the sites and
places spot markers or stakes next to the road to show which leases
are acquired.  ANDERSON did not pay STEVENS for this work.

ANDERSON asked ROACH to pick any random leases to
nominate for ANDERSON to purchase.  ROACH thought this was very
peculiar considering ANDERSON held himself out as an expert in the
oil industry.  ANDERSON claimed that he would put up the earnest
money to secure the leases.  He stated that he would FedEx a check
to BIA for the lease.  ROACH stated that she would not represent
ANDERSON until he paid her.  ANDERSON said he FedExed the check and
had a man name JOHN LONG JR. go to BIA to nominate the leases for
ANDERSON's purchase.  ROACH told ANDERSON that if he did not pay



FD-302a (Rev. 10-6-95)



318E-LA-251462

Continuation of FD-302 of ___NONA ROACH___ , On _03/02/2011_ , Page __4__

her, she would go to the BIA and tell them that he didn't pay his
bills and BIA would then reject his lease nomination. ROACH
believed that the FedEx check that ANDERSON was sending as the
earnest money for the purchase would be fraudulent. ROACH picked
up the FedEx check and was going to turn the check over to the BIA
as evidence of ANDERSON's fraudulent conduct. ROACH received
multiple calls from ANDERSON stating that he had reported the check
as stolen.

ROACH went to the BIA and the Mineral Counsel to present
evidence of ANDERSON's fraudulent activities. ROACH kept the FedEx
check. After the BIA looked into the situation, the Mineral
Counsel for the BIA barred ANDERSON and his affiliated entities and
akas (aka RON LAURENCE, Sunset Partners, Brighton Oil, Westar, and
others) from obtaining any future leases in Osage County.
ANDERSON's original 29 leases expired on or about February 18,
2008.

ROACH stated that ANDERSON did nothing to develop his
leases. ROACH believed ANDERSON never got oil permits for his
leases, never had pump jacks, did not use an operating company to
run the oil development, and never obtained active mineral reports.
In fact, ANDERSON had received an initial oil reserve report on the
land showing that it was not profitable. ROACH later received a
communication from COOLY stating that he (COOLY) had seen a
petroleum report that ANDERSON had altered showing inflated reserve
numbers.



ROACH stated that COOLY and the company Osage Energy were
being investigated by the Secret Service. Her contact at the
Secret Service was ROBERT IBOUX at ▓▓▓▓▓▓▓▓. ROACH recalled
ANDERSON telling her that he was a partner in Osage Energy. ROACH,
based on her conversations with IBOUX, knew that ANDERSON was not a
partner in the company. ASHVIN MASCARENHAS was a contact at Osage
Energy who could confirm that ANDERSON was not a partner and had
been puffing information about leases.

ROACH was aware of an investigation of the company, Terax
Energy. According to ROACH, a man named RON ACHS from Texas was
suing COOLY over Osage leases. These were the same leases where
ANDERSON was trying to assign (6 of his 29 leases) to a company,
Jed Oil, Inc. ANDERSON was trying to assign these leases in
approximately March 2008. ROACH mentioned that a man named TOM
THRALLS got involved with ANDERSON in an attempt to promote and
sell ANDERSON's 29 leases. ANDERSON was involved with a company



MASG 044445

FD-302a (Rev. 10-6-95)



318E-LA-251462

Continuation of FD-302 of ___NONA  ROACH_____, On _03/02/2011_, Page __5__

Geo Prospects Partners in the promotion and sale of his leases.
ROACH recalled a potential buyer, a man named DON ANDREE, who
wanted to see the wells that were on ANDERSON's acreage, but there
were no wells to see.  ROACH provided the following contact
information:  TOM THRALLS at ▉▉▉▉▉▉▉▉▉▉  RON ACHS at ▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉

    ROACH stated that the company Monterey Oil did not exist
although it had a website stating the office was located in Tulsa,
Oklahoma.





# EXHIBIT #3

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    04/26/2012

    NONA ROACH, cellular phone number of ▓▓▓▓▓▓▓▓▓▓▓ was advised of the official identities of the interviewing agents, including Assistant United States Attorney STEPHEN GOORVITCH and Internal Revenue Service Criminal Investigator, Special Agent MARTIN JUAREZ. After advising ROACH of the nature and purpose of the interview, she voluntarily provided the following information:

    ROACH, who confirmed with ELLEN Last Name Unknown (LNU) of the Bureau of Indian Affairs in Osage County, Oklahoma, telephone number ▓▓▓▓▓▓▓▓▓▓ stated that a company Redfork Oil Partners did not own or operate any oil leases in Osage County.

    The interviewing agents provided ROACH with a copy of a Purchase and Sale Agreement ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, dated September 4, 2008 (a copy of which is attached herein). ROACH reviewed the Purchase and Sale Agreement, including Exhibit A of the agreement which provided the lease descriptions, referred to as the "assets" for sale in the agreement.

    ROACH noted the following problems with the Purchase and Sale Agreement: (1) Redfork Oil Partners did not own any of the assets (leases) listed in Exhibit A; (2) the legal descriptions provided in Exhibit A were not valid legal descriptions; (3) two quarter sections of Sections 23 and 24 listed on Exhibit A were in fact owned and operated by her client, SONNY CARPENTER; (4) the Purchase and Sale Agreement itself was not the proper legal document to be used in a sale or assignment of leases in Osage County as the BIA authorizes sales and assignments and requires completion of BIA forms.

    ROACH stated that in September 2008 ANDERSON, through his company Sunset Energy, owned leases in the northeast quarter sections of Exhibit A sections 15, 23 , and possibly 24. Each Section consists of 640 acres and are delineated by quarter sections consisting of 160 acres each. ROACH could not confirm at the time of the interview, but believed ANDERSON's leases (14 month leases) expired in or about February 2009. The BIA only approves lease extensions on acreage that shows some development. ANDERSON did not show any production on his leases.

---

Investigation on    04/25/2012    at   Los Angeles, California

File #   318E-LA-251462                          Date dictated    04/26/2012

by    SA Allison Powojski

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MASG 044447

FD-302a (Rev. 10-6-95)

318E-LA-251462

Continuation of FD-302 of _____NONA ROACH_____, On 04/25/2012 , Page ___2___

    ROACH had not heard of the drilling company Geo Prospectors Partners.  ROACH never heard of the name ALEX SORIS, listed as the General Partner for Redfork Oil Partners listed in the Purchase and Sale Agreement.  ROACH did not know SORIS to be associated with any of the lease descriptions listed in Exhibit A.

    ROACH stated that in total, in 2008, ANDERSON and his company Sunset Energy, controlled approximately 160 acres of land consisting of 23 leases.  Many of ANDERSON's leases were located in a lake and ANDERSON never showed any production on any of his leases. ROACH noted that ANDERSON had nominated 60 additional leases for which he enlisted ROACH to represent him in Osage and secure for him.  ROACH refused to do any further work for ANDERSON unless he paid the outstanding bill for her previous services.  ROACH told ANDERSON that she would go to the BIA Minerals Board and report ANDERSON's refusal to pay her.  ROACH did go to the BIA and reported ANDERSON.  The BIA Minerals Board voted to not allow ANDERSON to purchase any further leases in Osage County with the exception of 6 he currently owned.

    ROACH stated that a company called Chaparell (Ph) currently operates some of the leases ANDERSON once controlled in Osage County and active wells exist on a portion of those acres.

    During the time ANDERSON owned leases in Osage County, in approximately 2008, there is no record of any production with respect to those leases, which would include plotting the land and showing accurate elevation levels and obtaining permits from the BIA to operated wells and begin drilling.  ROACH believed that ANDERSON's leases were undeveloped and worthless.

    ROACH recalled that ANDERSON came to Osage and took the WILLIAMS brothers, along with their representative RHONITA THORTON, out to some of the oil leases in Osage County.  ROACH was present on this tour.  ROACH stated that the leases ANDERSON showed the WILLIAMS brothers were productive leases owned and operated by STEVEN SHELLY CORNELIUS.  They were not the leases ANDERSON owned. ROACH was in her car when ANDERSON took the WILLIAMS brothers and THORTON to walk out on the land and did not specifically hear ANDERSON say who owned the land.

    ROACH was under the impression that ANDERSON came to Osage to purchase leases and was not expecting the WILLIAMS brothers and their representatives to be there. It was a surprise to ROACH when the WILLIAMS brother's ▆▆▆▆▆ showed up.

# EXHIBIT #4

10-K 1 csi10k2011.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE
# COMMISSION
Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** For the fiscal year ended **December 31, 2011**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF TH E SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____
**Commission file number 000-28911**

# CANNABIS SCIENCE, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 91-1869677 |
|---|---|
| (State or Other Jurisdiction of Incorporation of Organization) | (I.R.S. Employer Identification No.) |

**6946 N Academy Blvd, Suite B #254**
**Colorado Springs, CO 80918**
(Address of principal executive offices) (ZIP Code)

**(888) 889-0888**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: **None** Securities registered pursuant to Section 12(g) of the Act: **Common Stock**

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant as required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  Yes ☐ No ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.  (Check one):

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer  ☐     **Smaller reporting company** ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act) Yes ☐ No ☑

As of June 30, 2011 [this is supposed to be the most recent 2nd quarter so it shouldn't be updated], which was the last business day of the registrant's most recent second fiscal quarter, the aggregate market value of the registrant's

Common Stock held by non-affiliates of the registrant was $5,271,983 based on the closing sale price of $0.04 per share on that date. For the purposes of the foregoing calculation only, all directors, executive officers, related parties and holders of more than 10% of the issued and outstanding common stock of the registrant have been deemed affiliates.

Number of common shares outstanding at April 16, 2012: 384,670,574

## PART I

### ITEM 1. DESCRIPTION OF BUSINESS

#### Forward-looking Statements

This annual report contains forward-looking statements. These statements relate to future events or our future financial performance. In some cases, you can identify forward-looking statements by terminology such as "may", "will", "should", "expects", "plans", "anticipates", "believes", "estimates", "predicts", "potential" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors that may cause our or our industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements.

Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable laws, including the securities laws of the United States, we do not intend to update any of the forward-looking statements so as to conform these statements to actual results.

As used in this annual report, the terms "we", "us", "our", "the Company", and "Cannabis Science" mean Cannabis Science, Inc., unless otherwise indicated.

All dollar amounts refer to U.S. dollars unless otherwise indicated.

#### Overview

Cannabis Science, Inc. (formerly Gulf Onshore, Inc.) ("We", "us" or the Company"), was incorporated under the laws of the State of Colorado, on February 29, 1996, as Patriot Holdings, Inc. On August 26, 1999, the Company changed its name to National Healthcare Technology, Inc., and commenced a business plan to develop Magkelate, a patented intravenous drug developed to re-establish normal electrolyte balance in ischemic tissue and certain other patents for medical instruments and medical instrument technology. On January 14, 2000, the Company filed its Form 10SB12G. In 2002, the Company ceased its medical technology business following the death of Magkelate's inventor. The Company conducted no substantial business until 2005.

In July 2005, the Company acquired Es3, Inc., a Nevada Corporation ("Es3"), pursuant to the terms of an Exchange Agreement (the "Exchange Agreement") by and among the Company, Crown Partners, Inc., a Nevada corporation ("Crown Partners"), Es3, and certain stockholders of Es3 (the "Es3 Stockholders"). Under the terms of the Exchange Agreement, the Company acquired all of the outstanding capital stock of Es3 in exchange for the issuance of 191,828 shares of the Company's common stock (adjusted for splits) to the Es3 Stockholders, Crown Partners and certain consultants. The transactions effected by the Exchange Agreement were accounted for as a reverse merger, and recapitalization. In addition, the Company changed its accounting year-end from September 30 to December 31, which was Es3's accounting year-end. The Company then commenced business manufacturing and marketing products under the name Special Stone Surfaces. The Company sold its shares in Es3 in October 2005, and thereafter conducted no substantial business until 2006.

2

On April 3, 2006, the Company acquired a group of oil and gas leases in Oklahoma in exchange for issuance of common stock and commenced the business of oil and gas exploration and production, mineral lease purchasing and all activities associated with acquiring, operating and maintaining the assets of such operations. On June 6, 2007, the Company changed its name from National Healthcare Technology, Inc., to Brighton Oil & Gas, Inc., and converted to a Nevada corporation. The Company acquired additional oil and gas leases during 2007, all for issuance of common stock; in October 2007, the Company acquired leases from K & D Equity Investments, Inc., a Texas corporation in a transaction that effected a change of control, with K & D acquiring a majority stake in the Company. The Company also entered into a Line of Credit Agreement with South Beach Live, Inc., a Florida corporation, to provide it with working capital of up to $100,000 on a revolving credit line. The Agreement permitted South Beach the right to repayment on demand, or to convert amounts owed for shares.

On March 25, 2008 the Company changed its name to Gulf Onshore, Inc. On June 6, 2008, the Company entered into an Asset Acquisition Agreement with K & D to acquire additional leases (the "Leases") in exchange for common stock and a Stock Purchase Agreement ("SPA") with South Beach Live, Inc., a Florida corporation, to purchase 100% of the common shares of Curado Energy Resources, Inc., a Texas corporation ("Curado"). Curado is registered with the Texas Railroad Commission as an oil and gas well operator, and is the operator for the Leases. The Company acquired the Leases into Curado, in exchange for shares issued to K & D. The Company issued South Beach a promissory note for $250,000, payable in 1 year at 10% interest, which was guaranteed by Curado. The Company consolidated the operations of Curado commencing in 3Q 2008.

In August 2008, the Company granted South Beach a security interest in its Curado shares and the Curado assets, in exchange for concessions from South Beach regarding further cash advances and future stock conversions. This transaction was contemplated and further consummated by the Company due to declining oil prices throughout 3Q 2008 and increased operating costs, which made continued oil and gas operations on the Leases unprofitable. The Company was also continually drawing down on its Line of Credit Agreement with South Beach that created unsustainable working capital pressure.

On October 6, 2008, in the face of further oil price declines and general economic conditions, the Company and South Beach entered into an Accord and Satisfaction Agreement under which the Company surrendered its interest in the Putnam "M" oil and gas lease in Throckmorton Co., Texas in exchange for a complete release on the Promissory Note and Line of Credit. In addition, the Company waived any claim on the shares of Curado common stock that secured the Promissory Note or the assets of Curado. South Beach then made claim against Curado under the guarantee agreement and then exercised its rights under the collateral agreement. As a result, the Company's 4Q 2008, financial statements reflected the foreclosure of Curado and its assets, and furthermore that the Company has, once again, become a Development Stage Company seeking a new business partner or acquisition. A Form 8-K reflecting this transaction was timely filed.

On March 30, 2009, the Company entered into an agreement with Cannex Therapeutics, LLC, ("Cannex") a California limited liability company, and its principal, medical cannabis pioneer and entrepreneur Steven W. Kubby, to acquire all of their interest in certain assets used to conduct a cannabis research and development business. The asset purchase agreement includes all of Cannex's and Kubby's intellectual property rights, formulas, patents, trademarks, client base, hardware and software, including the website www.phytiva.com. The Company and its largest stockholder, K & D Equities, Inc., exchanged a total of 10,600,000 shares of common stock for the assets of Cannex; the Company issued 2,100,000 shares to Cannex, and K & D transferred 8,500,000 shares to Cannex and others. A Form 8-K reflecting this transaction was timely filed. Please see Note 1 to the financial statements.

3

As part of the Agreement, on April 1, 2009, the Company appointed Mr. Kubby as President and CEO, Richard Cowan as Director and CFO, and Robert Melamede Ph. D., as Director and Chief Science Officer. Each of them was also appointed as a director. All of the Company's current directors then resigned. On April 7, 2009, the Company changed its name to Cannabis Science, Inc., and obtained a new CUSIP number. Its shares now trade under the symbol CBIS.OB. A Form 8-K was timely filed, with a copy of the Asset Acquisition Agreement and Board Resolution ratifying the Agreement provided as exhibits thereto.

On April 7, 2009, the Company changed its name to Cannabis Science, Inc., reflecting its new business mission: Cannabis Science, Inc. is at the forefront of medical marijuana research and development. The Company works with world authorities on phytocannabinoid science targeting critical illnesses, and adheres to scientific methodologies to develop, produce, and commercialize phytocannabinoid-based pharmaceutical products. In sum, we are dedicated to the creation of cannabis-based medicines, both with and without psychoactive properties, to treat disease and the symptoms of disease, as well as for general health maintenance. The Company obtained a new CUSIP number as well. Cannabis Science Inc. has also launched its new website www.cannabisscience.com reflecting its new name.

On May 7, 2009 the Company common shares commenced trading under the new stock symbol OTCBB: CBIS.

On August 18, 2010, the Company entered into a license agreement with Rockbrook, Inc. to license its proprietary medical cannabis products and delivery methods. Rockbrook is a licensed Colorado medical marijuana dispensary. Under the license agreement, Rockbrook will pay license fees to Cannabis Science throughout the course of its operation. As of December 31, 2011, the Company is re-assessing the license agreement with Rockbrook and how to move forward in a cohesive arrangement with the other license agreements and acquisitions the Company is working on.

On February 9, 2012, the Company signed a license agreement with Apothecary Genetics Investments LLC, to produce several Cannabis Science Brand Formulations for the California medical cannabis market. As well, Apothecary will provide research and development facilities with full circle operations including a California laboratory facility for internal research and development, along with 16 unique genetic strains specifically generated and maintained by a cancer survivor who recognizes the importance of proper growth and breeding. In consideration of this agreement, on January 1, 2012, the Company entered into a 25 year management agreement with Dr. Mohammad Afaneh to act Chief Operating Officer of Cannabis Science, Inc. Dr. Afaneh received 28,500,000 common shares valued at $299,250 under this agreement. In addition, on February 10, 2012, Dr. Afaneh signed a management bonus agreement where he received 5,000,000 common shares valued at $185,000 as a signing bonus for entering into his management agreement. In addition, on January 1, 2012, the Company entered into a 25 year management agreement with Bret Bogue to act as Director of Horticulture and head of research and development. Mr. Bogue received 28,500,000 common shares valued at $299,250 under this agreement. In addition, on February 10, 2012, Mr. Bogue signed a management bonus agreement where he received 5,000,000 common shares valued at $185,000 as a signing bonus for entering into his management agreement.

On February 9, 2012, the Company acquired GGECO University, Inc. ("GGECO"), an online video-based medical cannabis education system, offering courses dealing with medical cannabis law, the benefits of medical marijuana, cooking, horticulture, and bud tending. Following the university's name change to Cannabis Science University, the Company hopes to use this platform to educate the general public, patients, and even those who have already been involved in the medical cannabis industry on the medical benefits of cannabis, how it is grown, how to use it safely, and the many applications or ways to administer the medication. In consideration of this agreement, the Company issued 25,000,000 common shares to the principals of GGECO.

4

On March 21, 2012, the Company acquired Cannabis Consulting Inc. ("CCI Group"), which consists of a group of businesses operated by Robert J. Kane, including: all contracted rights, properties, patents, trademarks, and distribution rights and agreements pertaining to Cannabis Consulting Inc., Robert Kane

Partners, Kaneabis Consulting, Kaneabis Fund, Kaneabis Report, and Kaneabis Radio.  In conjunction with the acquisitions, Robert Kane was promoted to V.P. of Investor Relations for the Company.  Consideration paid for the CCI Group was 1,000,000 common shares to issued to the principal, Mr. Robert Kane.

The Company is in the development stage as defined in Accounting Standards Codification ("ASC") Topic 915.

## ITEM 1A.  RISK FACTORS

Not applicable.

## ITEM 2.  PROPERTIES

We currently lease a laboratory and office space at 6946 N Academy Blvd, Suite B #254, Colorado Springs, CO 80918, on a month to month basis.

## ITEM 3.  LEGAL PROCEEDINGS

As of April 16, 2012, there are not any material pending legal proceedings, other than ordinary routine litigation incidental to our business, to which we or any of our subsidiaries, GGECO or CCI Group, are a party or of which any of our properties is the subject.  Also, our management is not aware of any legal proceedings contemplated by any governmental authority against us.

## ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

5

---

PART II

## ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

Our common stock is not traded on any exchange.  Our common stock is quoted on the OTC Bulletin Board, under the trading symbol "CBIS.OB".  The market for our stock is highly volatile.  We cannot assure you that there will be a market in the future for our common stock.  The OTC Bulletin Board securities are not listed and traded on the floor of an organized national or regional stock exchange.  Instead, OTC Bulletin Board securities transactions are conducted through a telephone and computer network connecting dealers in stocks.  OTC Bulletin Board stocks are traditionally smaller companies that do not meet the financial and other listing requirements of a regional or national stock exchange.
The following table shows the high and low prices of our common shares on the OTC Bulletin Board for each quarter within the two most recent fiscal years.  The following quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions:

| Fiscal Year Ending December 2010 | HIGH | LOW |
|---|---|---|
| Quarter Ending March 31, 2010 | 0.44 | 0.21 |
| Quarter Ending June 30, 2010 | 0.25 | 0.10 |
| Quarter Ending September 30, 2010 | 0.11 | 0.04 |
| Quarter Ending December 31, 2010 | 0.26 | 0.04 |

| Fiscal Year Ending December 2011 | HIGH | LOW |
|---|---|---|
| Quarter Ending March 31, 2011 | 0.14 | 0.03 |
| Quarter Ending June 30, 2011 | 0.09 | 0.04 |
| Quarter Ending September 30, 2011 | 0.06 | 0.02 |
| Quarter Ending December 31, 2011 | 0.03 | 0.01 |

6

---

### Holders

As of December 31, 2011, there were 235 stockholders of record, including CEDE & Co., which holds shares for the beneficial interest of an unknown number of stockholders in brokerage accounts.

### Dividends

We have not declared or paid cash dividends or made distributions in the past, and we do not anticipate that we will pay cash dividends or make distributions in the foreseeable future.  We currently intend to retain and reinvest future earnings, if any, to finance and expand our operations.

### Recent Sales of Unregistered Securities

During the fiscal year ended December 31, 2011, we did not sell any shares in unregistered offerings

As set out below, we have issued securities in exchange for services, properties and for debt, using exemptions available under the Securities Act of 1933.

During the three months ended December 31, 2011, the Company entered into debt settlement agreements with several parties as follows:

On October 4, 2011, the Company issued 6,500,000 common shares from the Company's 2011 Stock Compensation Plan B to two consultants for services rendered with a fair market value of $156,000 based on the closing price of the Company's common stock on September 28, 2011 which was $0.024 per share.

On October 12, 2011, the Company issued 8,000,000 common shares for settlement of $8,000 of stockholder debt, for a loss on settlement of $168,000, assigned from the stockholder note payable originating on July 15, 2010 and July 30, 2010, and owing at December 31, 2010.

On October 13, 2011, the Company issued 3,000,000 common shares for settlement of $3,000 of stockholder debt, for a loss on settlement of $64,200, assigned from the stockholder note payable originating on March 2, 2011.

On October 13, 2011, the Company issued 4,500,000 common shares from the Company's 2011 Stock Compensation Plan B to a consultant for services rendered with a fair market value of $100,800 based on the closing price of the Company's common stock on October 11, 2011 which was $0.0224 per share.

On October 26, 2011, the Company issued 5,800,000 common shares for settlement of $5,800 of stockholder debt, for a loss on settlement of $165,200, assigned from the stockholder note payable originating on July 15, 2010 and August 5, 2010, and owing at December 31, 2010.

On November 4, 2011, the Company issued 30,000,000 common shares for settlement of $30,000 of stockholder debt, for a loss on settlement of $570,000, assigned from the stockholder note payable originating on August 16, 2010, September 2, 10, 14, and 17, 2010 and October 7 and 13, 2010, and owing at December 31, 2010.

On November 22, 2011, the Company issued 17,000,000 common shares for settlement of $17,000 of stockholder debt, for a loss on settlement of $323,000, assigned from the stockholder note payable originating on August 16, 2010, September 2, 10 and 14, 2010 and October 13, 2010, and owing at December 31, 2010.

On November 23, 2011, the Company issued 9,000,000 common shares for settlement of $9,000 of stockholder debt, for a loss on settlement of $171,000, assigned from the stockholder note payable originating on August 16, 2010, and owing at December 31, 2010.

On December 9, 2011, the Company issued 13,500,000 common shares for settlement of $13,500 of stockholder debt, for a loss on settlement of $256,500, assigned from the stockholder note payable originating on March 2, 2011.

On December 21, 2011, the Company issued 18,500,000 common shares for settlement of $18,500 of stockholder debt, for a loss on settlement of $166,500, assigned from the stockholder note payable originating on October 13, 2010 and May 18, 2011.

On December 28, 2011, the Company issued 5,500,000 common shares for settlement of $13,500 of stockholder debt, for a loss on settlement of $256,500, assigned from the stockholder note payable originating on March 2, 2011.

All relating shares were issued to settle the aforementioned debt.

## ITEM 6.  SELECTED FINANCIAL DATA

Not applicable.

## ITEM 7.  MANAGEMENTS DISCUSSION AND ANALYSIS OR PLAN OF OPERATION.

This report contains forward looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended.  When used in this Form 10-K, the words "anticipate", "estimate", "expect", "project" and similar expressions are intended to identify forward-looking statements.  Such statements are subject to certain risks, uncertainties and assumptions including the possibility that the Company's proposed plan of operation will fail to generate projected revenues.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected.  The Company's actual results could differ materially from those set forth on the forward looking statements as a result of the risks set forth in the Company's filings with the Securities and Exchange Commission, general economic conditions, and changes in the assumptions used in making such forward looking statements.

### General

In Q1 of 2008, the Company acquired all of the assets of Cannex Therapeutics, LLC from Cannex and Steven W. Kubby, and committed to the research and development of cannabis based medical products.  The Company owns intellectual property related to a whole cannabis extract lozenge, which has demonstrated some efficacy in non-blind informal testing.  Other research indicates that cannabis extracts available in non-smoked forms, including lozenges and topical creams, may have medicinal uses in treating a variety of diseases, the symptoms of those diseases, and for analgesic purposes.

The Company is committed to research and development of cannabis extract medicines ("product") and intends to pursue Independent New Drug certification, possibly under the Orphan Drug Act, for such treatments but faces two significant challenges in accomplishing this business objective, namely financing and government regulation.

The Company is undercapitalized, and will be reliant on outside financing from sales of securities or issuance of debt instruments.  Management expects many traditional lenders will be reluctant to provide the Company with capital in light of its financial condition and the nature of its expected business; so that any financing activities will likely be expensive and result in dilution to stockholders of the Company.  In this regard, it should be noted that the Asset Acquisition Agreement among Cannex, the Company and K & D Equity Investments, Inc. contains non-dilution provisions that provided additional shares to K & D in the event our shares are sold privately for less than $1.00 per share.  The Company can make no representation that financing for its business will be available, regardless of cost.

Furthermore, although cannabis has been used for medicinal purposes for over 5,000 years, there is a significant prejudice against development of smoked cannabis medical products amongst the medical and law enforcement communities. In spite of recent statements by the current administration that indicate a softening of these views, marijuana is still classified as a controlled substance. The Company can provide no assurances that it can develop and market its intended product, or how long government approval, if obtained, will take.

### Recent Developments

Cannabis Science is laying a solid foundation for entrance into the FDA and other government regulatory agencies for developing medicines for cancer, autism, Influenza, PTSD and other ailments.

The Company's goal is not the legalization of marijuana, but instead the development of FDA-approved and legal non-smoked cannabis-based medicines. The Company faces not only the challenges of other business at an early stage of development, but special problems arising from the nature of its own business. Notwithstanding, stockholders and prospective stockholders should recognize that any investment in our Company is risky and speculative, and could result in a total loss.

### Results of Operations

*Limited Revenues*

Since our inception on January 27, 2005 to December 31, 2011, we have earned limited revenues of $90,107. During the fiscal year ended December 31, 2011 we generated license revenues of $73,702. As of December 31, 2011, we had an accumulated deficit of $70,536,669. At this time, our ability to generate any significant revenues continues to be uncertain. There is substantial doubt about our ability to continue as a going concern. Our financial statements do not include any adjustment that might result from the outcome of this uncertainty.

*Net Loss*

We incurred a net loss of $70,513,417 since January 27, 2005 (date of inception) to December 31, 2011. Our net loss increased, from $8,153,680 for the fiscal year ended December 31, 2010 to $8,339,044 for the fiscal year ended December 31, 2011, an increase of $185,364. For the fiscal year ended December 31, 2011, our net loss per share was $0.05, compared to a net loss per share for the fiscal year ended December 31, 2010.

*Expenses*

Our total expenses from January 27, 2005 (date of inception) to December 31, 2011 were $67,050,723 and consisted of $1,206,974 in investor relations, $32,806,677 in professional fees, $160,417 in technology license royalties, $5,089,811 in impairment of oil and gas well lease, $4,870,337 in net gain on settlement of liabilities, $81,582 in depreciation and amortization and $22,834,925 in general and administrative fees. Total expenses increased $221,547 to $8,412,158 for the fiscal year ended December 31, 2011 from total expenses of $8,190,611 for the same period in 2010.

Our investor relations expenses increased $24,680 to $86,182 for the fiscal year ended December 31, 2011 from $61,502 for the same period in 2010. This was due to increased stock related compensation for investor relations engagements in 2011 from 2010.

Our professional fees decreased $16,599 to $118,749 for the fiscal year ended December 31, 2011 from $135,348 for the same period in 2010 due to decreased securities filing activity.

The loss on settlement of liabilities increased $347,450 to $5,129,800 for the year ended December 31, 2011 from $4,782,350 in 2010. This increase was due to increased settlement of debt through stock and resulting losses on the settlements.

Our general and administrative expenses decreased by $129,056 from $3,184,121 for the fiscal year ended December 31, 2010 to $3,055,065 for the same period ended December 31, 2011. The decrease in general and administrative expenses was mainly due to an decrease in management and consulting fees for executives of the Company and consultants. Other general and administrative expenses consist of advertising, office supplies, transfer agent costs, travel expenses, rent, communication expenses (cellular, internet, fax, and telephone), office maintenance, courier and postage costs and office equipment.

9

### Liquidity and Capital Resources

As of December 31, 2011, our current assets totaled $5,325 which was comprised of $2,197 in cash and cash equivalents and $3,128 in prepaid expenses and deposits. As of December 31, 2011, we had $47,588 in intangible assets, net of accumulated amortization, $6,666 in long-term deposits, and $967 in property and equipment, net of accumulated depreciation. As of December 31, 2011 we had a working capital deficit of $2,285,621.

Our net loss of $70,573,417 from January 27, 2005 (date of inception) to December 31, 2011 was mostly funded by debt financing. We expect to incur substantial losses over the next two years. During the fiscal year ended December 31, 2011 our cash position increased slightly by $1,007.

During the fiscal year ended December 31, 2011, we received net cash of $237,480 from financing activities compared to $343,437 for the same period in 2010. We used net cash of $236,473 in operating activities compared to $341,876 for the same period in 2010. And we used net cash of $0 in investing activities compared for the fiscal year ended December 31, 2011 compared to $614 for the same period in 2010.

We are currently not in good short-term financial standing. We anticipate that we may only generate any limited revenues in the near future and we will not have enough positive internal operating cash flow until we can generate substantial revenues, which may take the next two years to fully realize. There is no assurance we will achieve profitable operations. We have historically financed our operations primarily by cash flows generated from the sale of our equity securities and through cash infusions from officers and outside investors in exchange for debt and/or common stock.

### Business Development

Our business and product development will follow two parallel paths. We will create cannabis pharmaceuticals with and without psychoactive properties. Both of these lines will have numerous proven health benefits for treating autism, blood pressure, cancer and cancer side effects, along with other illnesses, including for general health maintenance.

We are positioned to pursue the development of phytocannabinoid-based pharmaceutical grade products. The endocannabinoid system normally regulates blood pressure through its capacity to dilate blood vessels and reduce adrenergic stimuli. Additionally, there is a developing body of evidence that shows both the tumor killing properties of endo- and phyto- cannabinoids, and their ability to inhibit metastasis in a variety of cancers.

The Company is working to navigate the regulatory framework for its phytocannabinoid science towards developing cannabis-based therapeutics that will holistically promote health by restoring biochemical balance. By adhering to underlying scientific principles, the Company will manipulate all-pervasive phytocannabinoid processes to target a variety of disparate illnesses.

Cannabis Science is also positioning to explore insights that indicate an intrinsic link between novel cancer and HIV technologies and the cannabinoid system; with the goal of demonstrating that our pharmaceuticals will enhance biochemical markers that are indicative of a successful HIV therapy based on recent paradigm breaking discoveries.

10

The Company is currently focused on FDA approval of its first medical cannabis product targeted for veterans. Many veterans are already using herbal cannabis to self-medicate to relieve the symptoms of PTSD. Consequently, there is a clear need for standardized, FDA approved, oral cannabis products which can, and should be, provided to veterans and others who can benefit from its use. Medical cannabis has far fewer and milder side effects than most currently prescribed pharmaceutical products do. We are working hard to have one or more products ready for FDA clinical trials as soon as possible.

On February 9, 2012, the Company signed a license agreement with Apothecary to produce several Cannabis Science Brand Formulations for the California medical cannabis market. As well, Apothecary will provide research and development facilities with full circle operations including a California laboratory facility for internal research and development, along with 16 unique genetic strains specifically generated and maintained by a cancer survivor who recognizes the importance of proper growth and breeding.

On February 9, 2012, the Company acquired GGECO University, Inc. ("GGECO"), an online video-based medical cannabis education system, offering courses dealing with medical cannabis law, the benefits of medical marijuana, cooking, horticulture, and bud tending. Following the university's name change to Cannabis Science University, the Company hopes to use this platform to educate the general public, patients, and even those who have already been involved in the medical cannabis industry on the medical benefits of cannabis, how it is grown, how to use it safely, and the many applications or ways to administer the medication. In consideration of this agreement, the Company issued 25,000,000 common shares to the principals of GGECO.

On March 21, 2012, the Company acquired Cannabis Consulting Inc. ("CCI Group"), which consists of a group of businesses operated by Robert J. Kane, including: all contracted rights, properties, patents, trademarks, and distribution rights and agreements pertaining to Cannabis Consulting Inc., Robert Kane Partners, Kaneabis Consulting, Kaneabis Fund, Kaneabis Report, and Kaneabis Radio. In conjunction with the acquisitions, Robert Kane was promoted to V.P. of Investor Relations for the Company. Consideration paid for the CCI Group was 1,000,000 common shares to be issued to the principal, Mr. Robert Kane.

The Company anticipates having to raise additional capital to fund operations over the next 12 months. To the extent that it is required to raise additional funds to acquire properties, and to cover costs of operations, the Company intends to do so through additional public or private offerings of debt or equity securities.

As of December 31, 2011 the Company had two full-time employees.

## ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Not applicable.

## ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

11

**CANNABIS SCIENCE, INC.**

(A DEVELOPMENT STAGE COMPANY)

FINANCIAL STATEMENTS

DECEMBER 31, 2011

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheets | F-3 |
| Statements of Operations | F-4 |
| Statements of Stockholders' Equity/(Deficit) | F-5-6 |
| Statements of Cash Flows | F-7 |
| Notes to Financial Statements | F-8 to F-16 |

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
Cannabis Science, Inc.

We have audited the accompanying balance sheets of Cannabis Science, Inc. (the "Company") (a development stage company) as of December 31, 2011 and 2010 and the related statements of operations, stockholders' equity (deficit) and cash flows for the years then ended, and for the period January 27, 2005 (Inception) through December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Cannabis Science, Inc. at December 31, 2011 and 2010, and the results of its operations and its cash flows for the years then ended and for the period January 27, 2005 through December 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has no revenues and has a working capital deficiency, both of which raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Turner, Stone & Company, L.L.P.

Certified Public Accountants
Dallas, Texas
April 16, 2012

F-2

CANNABIS SCIENCE, INC.
(A DEVELOPMENT STAGE COMPANY)
BALANCE SHEETS
DECEMBER 31, 2011 AND 2010

| | December 31, 2011 $ | December 31, 2010 $ |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash | 2,197 | 1,190 |
| Prepaid expenses and deposits | 3,128 | 18,009 |
| Total current assets | 5,325 | 19,199 |
| | | |
| Deposits | 6,666 | 6,666 |
| Property and equipment, net of accumulated depreciation (Note 7) | 967 | 2,181 |
| Intangibles, net of accumulated amortization (Note 8) | 47,588 | 68,736 |
| TOTAL ASSETS | 60,546 | 96,782 |
| | | |
| LIABILITIES AND STOCKHOLDERS' DEFICIT | | |
| Current liabilities: | | |
| Accounts payable | 476,590 | 393,753 |
| Accrued expenses, primarily management fees | 1,163,126 | 375,000 |
| Advances from related parties | 156,818 | 107,835 |
| Advances from officer | - | 1,807 |
| Convertible management bonuses | 300,000 | 300,000 |
| Advances from stockholders | 194,413 | 171,509 |
| Deferred license revenue | - | 73,334 |
| Total current liabilities | 2,290,947 | 1,423,238 |
| | | |
| Commitments and contingencies (Note 6) | | |
| | | |
| Stockholders' deficit: | | |
| Preferred stock, $.001 par value, 1,000,000 shares authorized, 999,999 shares issued and outstanding at December 31, 2011 and 2010 | 1,000 | 1,000 |
| Common stock, $.001 par value, 850,000,000 shares authorized, 305,420,574 issued and outstanding at December 31, 2011 and 101,170,574 at December 31, 2010 | 305,421 | 101,171 |
| Common stock, Class A, $.001 par value, 100,000,000 shares authorized, 0 issued and outstanding as of December 31, 2011 and 2010 | - | - |
| Prepaid consulting | (379,156 ) | (1,322,630) |
| Additional paid-in capital | 68,379,003 | 62,091,628 |
| Deficit accumulated during the development stage | (70,536,669 ) | (62,197,625) |
| Total stockholders' deficit | (2,230,401 ) | (1,326,456) |
| | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | 60,546 | 96,782 |

*The accompanying notes are an integral part of these financial statements.*

F-3

**CANNABIS SCIENCE, INC.**
(A DEVELOPMENT STAGE COMPANY)
STATEMENTS OF OPERATIONS
FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2010
AND THE CUMULATIVE PERIOD FROM JANUARY 27, 2005 (INCEPTION) TO DECEMBER 31, 2011

| | December 31, 2011 $ | December 31, 2010 $ | Period from January 27, 2005 (inception) to December 31, 2011 $ |
|---|---|---|---|
| REVENUE | 73,702 | 4,166 | 90,107 |
| | | | |
| OPERATING EXPENSES | | | |
| Investor relations | 86,182 | 73,337 | 1,218,809 |
| Professional fees | 118,749 | 135,348 | 32,769,929 |
| Technology license royalties | | | 160,417 |
| Impairment of oil and gas well lease | | | 5,089,811 |
| Net loss (gain) on settlement of liabilities | 5,129,800 | 4,647,500 | 4,735,487 |
| Depreciation and amortization | 22,362 | 27,290 | 81,582 |
| General and administrative | 3,055,065 | 3,307,135 | 22,957,939 |
| Total operating expenses | 8,412,158 | 8,190,611 | 67,013,974 |
| | | | |
| OPERATING PROFIT (LOSS) | (8,338,456) | (8,186,445) | (66,923,867) |
| | | | |
| Other income | | 35,791 | 66,021 |
| Interest expense, net | (588) | (3,026) | (153,962) |
| Beneficial conversion feature | | | (1,098,992) |
| | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (8,339,044) | (8,153,680) | (68,110,800) |
| | | | |
| Income tax provision | - | - | (2,035,065) |
| Income tax benefit (Note 3) | - | - | 1,210,270 |
| | | | (824,795) |
| NET INCOME (LOSS) FROM CONTINUING OPERATIONS | (8,339,044) | (8,153,680) | (68,935,595) |
| | | | |
| Discontinued operations | - | - | (2,425,869) |
| Income tax benefit | - | - | 824,795 |
| | | | (1,601,074) |
| NET INCOME (LOSS) | (8,339,044) | (8,153,680) | (70,536,669) |
| | | | |
| NET INCOME (LOSS) PER SHARE FROM CONTINUING OPERATIONS – BASIC AND DILUTED | (0.05) | (0.13) | |
| NET INCOME (LOSS) PER SHARE FROM DISCONTINUED OPERATIONS – BASIC AND DILUTED | | | |
| NET INCOME (LOSS) PER SHARE – BASIC AND DILUTED | (0.05) | (0.13) | |
| WEIGHTED AVERAGE SHARES OUTSTANDING – BASIC AND DILUTED | 152,228,519 | 63,098,346 | |

*The accompanying notes are an integral part of these financial statements.*

F-4

**CANNABIS SCIENCE, INC.**
(A DEVELOPMENT STAGE COMPANY)
STATEMENT OF STOCKHOLDERS' EQUITY/(DEFICIT)
FOR THE PERIOD FROM JANUARY 27, 2005 (INCEPTION) TO DECEMBER 31, 2011

| | Common Shares | Par $ | Preferred Shares | Par $ | Additional Paid-in Capital $ | Prepaid Consulting | Accumulated Deficit $ | Totals $ |
|---|---|---|---|---|---|---|---|---|
| Balance at January 27, 2005 | | | | | | | | |
| | | | | | | | | |
| Founder's Stock Issued | 83,800 | 84 | | | (84) | - | - | |
| Stock Issued for Debt | 8,000 | 8 | | | 399,992 | | - | 400,000 |
| Shares Issued for License Agreement | 86,188 | 86 | | | (86) | | - | |
| Effect of Reverse Merger | 13,840 | 14 | | | (200,014) | | - | (200,000) |
| Divestiture of Subsidiary to Related Party | - | - | | | 544,340 | | - | 544,340 |
| Net Loss | - | - | | | - | - | (807,600) | (807,600) |
| | | | | | | | | |
| Balance at December 31, 2005 | 191,828 | 192 | - | - | 744,148 | - | (807,600) | (63,260) |

| | Shares | Amount | Pref. Shares | Pref. Amount | Paid-in Capital | Deferred/Unearned | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| Shares Issued for Employment | 45,500 | 45 | | | 8,487,455 | - | - | 8,487,500 |
| Shares Issued for Services | 171,080 | 171 | | | 28,798,329 | ( 7,633,750) | | 21,164,750 |
| Shares Issued for Lease Agreement | 6,770 | 7 | | | 406,193 | - | (350,200) | 56,000 |
| Net Loss | | | | | | | (36,906,584) | (36,906,584) |
| Balance at December 31, 2006 | 415,178 | 415 | - | - | 38,436,125 | ( 7,633,750) | (38,064,384) | (7,261,594) |
| Shares Issued For Services | 63,020 | 63 | | | 528,285 | ( 387,500) | | 140,848 |
| Shares Issued for Debt Conversion | 350,000 | 350 | | | 349,650 | | - | 350,000 |
| Amortization of Beneficial Conversion Feature | - | - | | | 1,066,657 | | | 1,066,657 |
| Amortization of shares issued for services | - | - | | | | 8,021,250 | | 8,021,250 |
| Shares Issued for Properties | 500,000 | 500 | | | 4,999,500 | - | | 5,000,000 |
| Net loss | - | - | - | - | | | (15,007,117) | (15,007,117) |
| Balance at December 31, 2007 | 1,328,198 | 1,328 | - | - | 45,380,217 | - | (53,071,501) | (7,689,956) |
| Amortization of Beneficial Conversion Feature | | | | | 32,335 | | | 32,335 |
| Cancellation and Amortization of Shares | (919) | (1) | | | 1 | | | - |
| Common stock issued for cash | 10,000 | 10 | | | 19,990 | | | 20,000 |
| Common stock issued for debt conversion | 990,000 | 990 | | | 98,010 | | | 99,000 |
| Common stock issued for acquisition | 10,000,000 | 10,000 | | | 2,490,000 | | | 2,500,000 |
| Common stock issued for services | 270,000 | 270 | | | 128,230 | | | 128,500 |
| Net Income | | | | | | - | 3,559,617 | 3,559,617 |
| Balance at December 31, 2008 | 12,597,279 | 12,597 | - | - | 48,148,783 | | (49,511,884) | (1,350,504) |
| Common stock issued for cash | 2,522,495 | 2,523 | | | 197,552 | | | 200,075 |
| Common stock issued for services | 8,855,000 | 8,855 | | | 2,507,195 | | | 2,516,050 |
| Cancellation of stock | (10,000) | (10) | | | 10 | | - | - |
| Common stock issued for debt settlements | 3,680,000 | 3,680 | | | 2,020,320 | | | 2,024,000 |
| Preferred stock issued for services | - | - | 999,999 | 1,000 | | | | 1,000 |
| Stock issued for assets | 2,100,000 | 2,100 | | | 123,900 | | | 126,000 |
| Net Loss | - | - | - | - | | | (4,532,061) | (4,532,061) |
| Balance at December 31, 2009 | 29,744,774 | 29,745 | 999,999 | 1,000 | 52,997,760 | - | (54,043,945) | (1,015,440) |
| Common stock issued for cash | 1,245,800 | 1,246 | | | 137,540 | | | 138,786 |
| Common stock issued for services | 26,680,000 | 26,680 | | | 3,670,978 | (3,530,808) | | 166,850 |
| Amortization of shares issued for services | | | | | | 2,208,178 | | 2,208,178 |
| Common stock issued for debt settlements | 42,750,000 | 42,750 | | | 5,249,600 | - | | 5,292,350 |
| Common stock issued for acquisition write-off | 350,000 | 350 | | | 36,150 | - | | 36,500 |
| Shares pending cancelation | 400,000 | 400 | | | (400) | | | - |
| Net Loss | - | | - | | | | (8,153,680) | (8,153,680) |
| Balance at December 31, 2010 | 101,170,574 | 101,171 | 999,999 | 1,000 | 62,091,628 | (1,322,630) | (62,197,625) | (1,326,456) |
| Common stock issued for services | 37,250,000 | 36,850 | | | 1,157,575 | (1,146,700) | | 47,725 |
| Amortization of shares issued for services | | | | | | 2,090,174 | | 2,090,174 |
| Common stock issued for debt settlements | 167,400,000 | 167,400 | | | 5,129,800 | | | 5,297,200 |
| Net Loss | | | | | | | (8,339,044) | (8,339,044) |
| Balance at December 31, 2011 | 305,820,574 | 305,421 | 999,999 | 1,000 | 68,379,003 | (379,156) | (70,536,669) | (2,230,401) |

*The accompanying notes are an integral part of these financial statements.*

Case 2:11-cr-00199-PA www.otcedgar.com - File 06/04/12 (Page 40 of 58) Page ID #:585

F-5

**CANNABIS SCIENCE, INC.**
(A DEVELOPMENT STAGE COMPANY)
STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2010
AND THE CUMULATIVE PERIOD FROM JANUARY 27, 2005 (INCEPTION) TO DECEMBER 31, 2011

| | Common Shares | Par $ | Preferred Shares | Preferred Par | Additional Paid-in Capital $ | Prepaid Consulting | Accumulated Deficit $ | Totals $ |
|---|---|---|---|---|---|---|---|---|
| Balance at January 27, 2005 | - | - | - | - | - | - | - | - |
| Founder's Stock Issued | 83,800 | 84 | | | (84) | - | - | - |
| Stock Issued for Debt | 8,000 | 8 | | | 399,992 | - | - | 400,000 |
| Shares Issued for License Agreement | 86,188 | 86 | | | (86) | - | - | - |
| Effect of Reverse Merger | 13,840 | 14 | | | (200,014) | - | - | (200,000) |
| Divestiture of Subsidiary to Related Party | - | - | | | 544,340 | - | - | 544,340 |
| Net Loss | | | | | | | (807,600) | (807,600) |
| Balance at December 31, 2005 | 191,828 | 192 | | | 744,148 | - | (807,600) | (63,260) |
| Shares Issued for Employment | 45,500 | 45 | | | 8,487,455 | - | - | 8,487,500 |
| Shares Issued for Services | 171,080 | 171 | | | 28,798,329 | ( 7,633,750) | - | 21,164,750 |
| Shares Issued for Lease Agreement | 6,770 | 7 | | | 406,193 | - | (350,200) | 56,000 |
| Net Loss | - | - | | | - | - | (36,906,584) | (36,906,584) |
| Balance at December 31, 2006 | 415,178 | 415 | | | 38,436,125 | ( 7,633,750) | (38,064,384) | (7,261,594) |
| Shares Issued For Services | 63,020 | 63 | | | 528,285 | ( 387,500) | - | 140,848 |
| Shares Issued for Debt Conversion | 350,000 | 350 | | | 349,650 | - | - | 350,000 |
| Amortization of Beneficial Conversion Feature | - | - | | | 1,066,657 | - | - | 1,066,657 |
| Amortization of shares issued for services | - | - | | | - | 8,021,250 | - | 8,021,250 |
| Shares Issued for Properties | 500,000 | 500 | | | 4,999,500 | - | - | 5,000,000 |
| Net loss | - | - | | | - | - | (15,007,117) | (15,007,117) |
| Balance at December 31, 2007 | 1,328,198 | 1,328 | | | 45,380,217 | - | (53,071,501) | (7,689,956) |
| Amortization of Beneficial Conversion Feature | - | - | - | - | 32,335 | - | - | 32,335 |
| Cancellation and Amortization of Shares | (919) | (1) | - | - | 1 | - | - | - |
| Common stock issued for cash | 10,000 | 10 | - | - | 19,990 | - | - | 20,000 |
| Common stock issued for debt conversion | 990,000 | 990 | - | - | 98,010 | - | - | 99,000 |
| Common stock issued for acquisition | 10,000,000 | 10,000 | - | - | 2,490,000 | - | - | 2,500,000 |
| Common stock issued for services | 270,000 | 270 | - | - | 128,230 | - | - | 128,500 |
| Net Income | | | | | | - | 3,559,617 | 3,559,617 |
| Balance at December 31, 2008 | 12,597,279 | 12,597 | - | - | 48,148,783 | - | (49,511,884) | (1,350,504) |
| Common stock issued for cash | 2,522,495 | 2,523 | | | 197,552 | - | | 200,075 |
| Common stock issued for services | 8,855,000 | 8,855 | | | 2,507,195 | - | | 2,516,050 |
| Cancellation of stock | (10,000) | (10) | | | 10 | - | | - |
| Common stock issued for debt settlements | 3,680,000 | 3,680 | | | 2,020,320 | - | | 2,024,000 |
| Preferred stock issued for services | - | - | 999,999 | 1,000 | - | - | | 1,000 |
| Stock issued for assets | 2,100,000 | 2,100 | | | 123,900 | - | | 126,000 |
| Net Loss | - | - | | | - | - | (4,532,061) | (4,532,061) |
| Balance at December 31, 2009 | 29,744,774 | 29,745 | 999,999 | 1,000 | 52,997,760 | - | (54,043,945) | (1,015,440) |
| Common stock issued for cash | 1,245,800 | 1,246 | | | 137,540 | - | | 138,786 |
| Common stock issued for services | 26,680,000 | 26,680 | | | 3,670,978 | (3,530,808) | | 166,850 |
| Amortization of shares issued for services | | | | | - | 2,208,178 | | 2,208,178 |
| Common stock issued for debt settlements | 42,750,000 | 42,750 | | | 5,249,600 | - | | 5,292,350 |
| Common stock issued for acquisition write-off | 350,000 | 350 | | | 36,150 | - | | 36,500 |
| Shares pending cancelation | 400,000 | 400 | | | (400) | - | | - |
| Net Loss | - | - | | | - | - | (8,153,680) | (8,153,680) |
| Balance at December 31, 2010 | 101,170,574 | 101,171 | 999,999 | 1,000 | 62,091,628 | (1,322,630) | (62,197,625) | (1,326,456) |
| Common stock issued for services | 37,250,000 | 36,850 | | | 1,157,575 | (1,146,700) | | 47,725 |
| Amortization of shares issued for services | - | - | - | - | - | 2,090,174 | - | 2,090,174 |
| Common stock issued for debt settlements | 167,400,000 | 167,400 | | | 5,129,800 | - | | 5,297,200 |
| Net Loss | - | - | - | - | - | - | (8,339,044) | (8,339,044) |
| Balance at December 31, 2011 | 305,820,574 | 305,421 | 999,999 | 1,000 | 68,379,003 | (379,156) | (70,536,669) | (2,230,401) |

Filed by OTC Filings - www.otcedgar.com - 1-866-832-FILE (3453) - Cannabis Science Page # 586

*The accompanying notes are an integral part of these financial statements.*

F-6

CANNABIS SCIENCE, INC.
(A DEVELOPMENT STAGE COMPANY)
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### A. Organization and General Description of Business

Cannabis Science, Inc. ("We" or "the Company"), was incorporated under the laws of the State of Colorado, on February 29, 1996, as Patriot Holdings, Inc. On August 26, 1999, the Company changed its name to National Healthcare Technology, Inc., and commenced a business plan to develop Magkelate, a patented intravenous drug developed to re-establish normal electrolyte balance in ischemic tissue and certain other patents for medical instruments and medical instrument technology. On January 14, 2000, the Company filed its Form 10SB12G. In 2002, the Company ceased its medical technology business following the death of Magkelate's inventor. The Company conducted no substantial business until 2005.

In July 2005, the Company acquired Es3, Inc., a Nevada Corporation ("Es3"), pursuant to the terms of an Exchange Agreement (the "Exchange Agreement") by and among the Company, Crown Partners, Inc., a Nevada corporation ("Crown Partners"), Es3, and certain stockholders of Es3 (the "Es3 Stockholders"). Under the terms of the Exchange Agreement, the Company acquired all of the outstanding capital stock of Es3 in exchange for the issuance of 191,828 shares of the Company's common stock (adjusted for splits) to the Es3 Stockholders, Crown Partners and certain consultants. The transactions effected by the Exchange Agreement were accounted for as a reverse merger, and recapitalization. In addition, the Company changed its accounting year-end from September 30 to December 31, which was Es3's accounting year-end. The Company then commenced business manufacturing and marketing products under the name Special Stone Surfaces. The Company sold its shares in Es3 in October 2005, and thereafter conducted no substantial business until 2006.

On April 3, 2006, the Company acquired a group of oil and gas leases in Oklahoma in exchange for issuance of common stock and commenced the business of oil and gas exploration and production, mineral lease purchasing and all activities associated with acquiring, operating and maintaining the assets of such operations. On June 6, 2007, the Company changed its name from National Healthcare Technology, Inc., to Brighton Oil & Gas, Inc., and converted to a Nevada corporation. The Company acquired additional oil and gas leases during 2007, all for issuance of common stock; in October 2007, the Company acquired leases from K & D Equity Investments, Inc., a Texas corporation in a transaction that effected a change of control, with K & D acquiring a majority stake in the Company. The Company also entered into a Line of Credit Agreement with South Beach Live, Inc., a Florida corporation, to provide it with working capital of up to $100,000 on a revolving credit line. The Agreement permitted South Beach the right to repayment on demand, or to convert amounts owed for shares.

On March 25, 2008, the Company changed its name to Gulf Onshore, Inc. On June 6, 2008, the Company entered into an Asset Acquisition Agreement with K & D to acquire additional leases (the "Leases") in exchange for common stock and a Stock Purchase Agreement ("SPA") with South Beach Live, Inc., a Florida corporation, to purchase 100% of the common shares of Curado Energy Resources, Inc., a Texas corporation ("Curado"). Curado is registered with the Texas Railroad Commission as an oil and gas well operator, and is the operator for the Leases. The Company acquired the Leases through Curado, in exchange for shares issued to K & D. The Company issued South Beach a promissory note for $250,000, payable in 1 year at 10% interest, which was guaranteed by Curado. The Company consolidated the operations of Curado commencing in 3Q 2008.

In August 2008, the Company granted South Beach a security interest in its Curado shares and the Curado assets, in exchange for concessions from South Beach regarding further cash advances and future stock conversions. This transaction was contemplated and further consummated by the Company due to declining oil prices throughout 3Q 2008 and increased operating costs, which made continued oil and gas operations on the Leases unprofitable. The Company was also continually drawing down on its Line of Credit Agreement with South Beach that created unsustainable working capital pressure.

F-7

On October 6, 2008, in the face of further oil price declines and general economic conditions, the Company and South Beach entered into an Accord and Satisfaction Agreement under which the Company surrendered its interest in the Putnam "M" oil and gas lease in Throckmorton Co., Texas in exchange for a complete release on the Promissory Note and Line of Credit. In addition, the Company waived any claim on the shares of Curado common stock that secured the Promissory Note or the assets of Curado. South Beach then made claim against Curado under the guarantee agreement and then exercised its rights under the collateral agreement. As a result, the Company's 4Q 2008, financial statements reflected the disposition of Curado and its assets, and furthermore that the Company has, once again, become a Development Stage Company seeking a new business partner or acquisition. A Form 8-K reflecting this transaction was timely filed.

On March 30, 2009, the Company entered into an agreement with Cannex Therapeutics, LLC, ('Cannex") a California limited liability company, and its principal, medical cannabis pioneer and entrepreneur Steven W. Kubby, to acquire all of their interest in certain assets used to conduct a cannabis research and development business. The asset purchase agreement includes all of Cannex' and Kubby's intellectual property rights, formulas, patents, trademarks, client base, hardware and software, including the website www.phytiva.com. The Company and its largest stockholder, K & D Equities, Inc., exchanged a total of 10,600,000 shares of common stock for the assets of Cannex; the Company issued 2,100,000 shares to Cannex, and K & D transferred 8,500,000 shares to Cannex and others. A Form 8-K reflecting this transaction was timely filed.

As part of the Agreement, on April 1, 2009, the Company appointed Mr. Kubby as President and CEO, Richard Cowan as Director and CFO, and Robert Melamede Ph. D., as Director and Chief Science Officer. Each of them was also appointed as a director. All of the Company's current directors then resigned. On April 7, 2009, the Company changed its name to Cannabis Science, Inc., and obtained a new CUSIP number. Its shares now trade under the symbol CBIS.OB. A Form 8-K was timely filed, with a copy of the Asset Acquisition Agreement and Board Resolution ratifying the Agreement provided as exhibits thereto.

Cannabis Science, Inc. is at the forefront of medical marijuana research and development. The Company works with world authorities on phytocannabinoid science targeting critical illnesses, and adheres to scientific methodologies to develop, produce, and commercialize phytocannabinoid-based pharmaceutical products. In sum, we are dedicated to the creation of cannabis-based medicines, both with and without psychoactive properties, to treat disease and the symptoms of disease, as well as for general health maintenance. Cannabis Science Inc. has also launched its new website www.cannabisscience.com reflecting its new name.

On May 7, 2009 the Company common shares commenced trading under the new stock symbol OTCBB: CBIS.

*B. Basis of Presentation*

The Company prepares its financial statements on the accrual basis of accounting. The financial statements include the accounts of Curado Energy Resources Inc., a former operating subsidiary, for the period from June 2008 through September 2008.

Cannabis Science, Inc. (formerly Gulf Onshore, Inc.), up until the June 30, 2008 filing has filed as a Development Stage Company, as defined by Accounting Standards Codification ("ASC") Topic 915, "Development Stage Entities". The Company currently files as a development stage entity and is devoting its efforts to establish new business in medical marijuana products.

*C. Stock Splits*

On March 6, 2008 the Directors of Gulf Onshore, Inc. (the "Company) announced a one for ten (1:10) reverse stock split (the "Reverse Split") and a contemporaneous one for ten (1:10) reduction in the number of the Company's authorized shares of common stock, par value $0.001 (the "Common Stock"), in accordance with the procedure authorized by Nevada Revised Statutes ("N.R.S.") §78.207. The Directors determined that it would be in the Company's best interest to effect the Reverse Split and approved this corporate action by unanimous written consent. The Reverse Split did not require stockholder approval. All shares referenced, except where otherwise noted, are net of the Reverse Split.

F-8

#### D. Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Estimates and assumptions are reviewed periodically and the effects of revisions are reflected in the financial statements in the period they are determined.

#### E. Cash and Cash Equivalents

Cash and cash equivalents include cash in hand and cash in time deposits, certificates of deposit and all highly liquid debt instruments with original maturities of three months or less.

#### F. Long-Lived Assets & Impairment on oil lease investments

Under ASC Topic 360, "Property, Plant, and Equipment", the Company is required to periodically evaluate the carrying value of long-lived assets to be held and used. ASC Topic 360 requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. In that event, a loss is recognized based on the amount by which the carrying amount exceeds the fair market value of the long-lived assets. Loss on long-lived assets to be disposed of is determined in a similar manner, except that fair market values are reduced for the cost of disposal.

During the year ended December 31, 2008, the Company had acquired two oil & gas leases in two separate transactions. One lease was acquired for cash consideration of $30,000 and the other lease was acquired in exchange of 50,000,000 (pre reverse split of March 1, 2008) shares. The lease was valued at the fair market value of the shares which was $5,000,000.

As of December 31, 2008, the Company estimated the future cash flows expected to result from the use and eventual disposition of the two oil & well gas leases. Based on its review, the Company determined that the carrying value of the assets is not recoverable and hence the leases were determined to be impaired as of December 31, 2008. The Company recorded an impairment loss of $5,030,000 for the year ended December 31, 2008.

In June 2008 the Company acquired eleven oil well leases in a related party transaction with the majority stockholder, K&D Investments, for 10,000,000 shares. The value of the stock at the time of the transaction was $2,500,000 and the predecessor cost was $100,000. Therefore, an impairment of $2,400,000 was recorded related to the transaction and the net cost recorded on the Company's balance sheet was $100,000. The Leases were acquired from Curado Energy Resources, Inc., the operator of the Leases, which the Company acquired from South Beach Live, Inc., its most significant creditor.

Throughout 3Q 2008, declining oil prices and increased operating costs made continual oil and gas operations on the Leases unprofitable, and the Company was continually drawing down on its Line of Credit Agreement with South Beach. In exchange for concessions from South Beach regarding further cash advances and future stock conversions, in August 2008, the Company agreed to grant South Beach a security interest in its South Beach shares.

On October 6, 2008, in the face of further oil price declines and general economic conditions, the Company and South Beach entered into an Accord and Satisfaction Agreement under which the Company surrendered its interest in the Putnam "M" oil and gas lease in Throckmorton Co., Texas in exchange for a complete release on the Promissory Note and Line of Credit. In addition, the Company waived any claim on the shares of Curado common stock that secured the Promissory Note or the assets of Curado. As a result, the Company's 4Q 2008, financial statements reflect the disposition of Curado and its assets, and furthermore that the Company, once again, became a Development Stage Company seeking a new business partner or acquisition. A Form 8-K reflecting this transaction was timely filed.

#### G. Fair Value of Financial Instruments

Under ASC Topic 820, the Company discloses the estimated fair values of financial instruments. The carrying amounts reported in the balance sheet for current assets and current liabilities qualifying as financial instruments are a reasonable estimate of fair value.

In accordance with the reporting requirements of ASC Topic 825, Financial Instruments, the Company calculates the fair value of its assets and liabilities which qualify as financial instruments under this standard and includes this additional information in the notes to the financial statements when the fair value is different than the carrying value of those financial instruments. The estimated fair value of current assets and current liabilities approximate their carrying amounts due to the relatively short maturity of these instruments. None of these instruments are held for trading purposes.

F-9

#### H. Fair Value Measurements

ASC Topic 820, Fair Value Measurements and Disclosures, defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles, and requires certain disclosures about fair value measurements. In general, fair values of financial instruments are based upon quoted market prices, where available. If such quoted market prices are not available, fair value is based upon internally developed models that primarily use, as inputs, observable market-based parameters. Valuation adjustments may be made to ensure that financial instruments are recorded at fair value. These adjustments may include amounts to reflect counterparty credit quality and the customer's creditworthiness, among other things, as well as unobservable parameters. Any such valuation adjustments are applied consistently over time.

#### I. Technology License and Royalties

The Company's former principal business activity focused on oil and gas exploration. We have divested ourselves of all oil and gas properties and are investigating other business opportunities. We have no technology licenses or rights to any royalties for formerly owned oil and gas properties

The Company is entitled to an annual license fee of $25,000 for the first year, $50,000 for the second year, $75,000 for the third year, $100,000 for the fourth year and $150,000 for the fifth and successive years, in addition to royalty license fees for 50% of all revenues, receipts, monies and the fair market value of any securities directly or indirectly received by Rockbrook, Inc. as a result of and pursuant to the license agreement entered into with the Company on July 30, 2010. As of December 31, 2011, the Company is re-assessing the license agreement with Rockbrook and how to move forward in a cohesive arrangement with the other license agreements and acquisitions the Company is working on. (See Financial Statement Note 6(c))

#### J. Stock-Based Compensation

Under ASC Topic 718, "Compensation-Stock Compensation", the Company is required to measure all employee share-based payments, including grants of employee stock options, using a fair-value-based method and the recording of such expense in the statements of operations. The Company has adopted ASC Topic 718 (SFAS 123R) as of January 1, 2006 and recognizes stock-based compensation expense using the modified prospective method.

#### K. Income Taxes

Under ASC Topic 740, "Income Taxes", the Company in required to account for its income taxes through the establishment of a deferred tax asset or liability for the recognition of future deductible or taxable amounts and operating loss and tax credit carry forwards. Deferred tax expense or benefit is recognized as a result of timing differences between the recognition of assets and liabilities for book and tax purposes during the year.

Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. Deferred tax assets are recognized for deductible temporary differences and operating loss, and tax credit carry forwards. A valuation

allowance is established to reduce that deferred tax asset if it is "more likely than not" that the related tax benefits will not be realized.

**Unfiled Federal Tax Returns**

In February 2009, the Company filed appropriate federal tax returns for the years ending December 31, 2003 through 2007 and may be subject to failure to file penalties.  For the years ending December 31, 2008 through December 31, 2011, the Company has not filed any federal tax returns.  The Company estimates that the amount of penalties, if any, will not have a material effect on the results of operations, cash flows or financial position.  No provisions have been made in the financial statements for such penalties, if any.

*L. Basic and Diluted Net Earnings (loss) per Share*

Under ASC Topic 260, "Earnings Per Share" ("EPS"), the Company provides for the calculation of basic and diluted earnings per share.  Basic EPS includes no dilution and is computed by dividing income or loss available to common stockholders by the weighted average number of common shares outstanding for the period.  Diluted EPS reflects the potential dilution of securities that could share in the earnings or losses of the entity.  For the periods January 1, 2010 to December 31, 2011, basic and diluted loss per share are the same since the calculation of diluted per share amounts would result in an anti-dilutive calculation.

F-10

*M. Development Stage Enterprise*

The Company is currently in the development stage as defined under the provisions of ASC Topic 915-10.  In October 2008, the Company divested itself of its operating company, Curado Energy Resources, Inc.  Beginning with the fiscal fourth quarter of 2008 the Company again became a development stage company.  The Company is working on developing its medical cannabis business, which will be comprised of cannabinoid medicines approved through the FDA along with non-psychotropic medicines for the naturopathy market.

*N. Recent Accounting Pronouncements*

During the year ended December 31, 2011 and through April 16, 2012, there were several new accounting pronouncements issued by the FASB the most recent of which was update no. 2011-12 – Comprehensive Income: Deferral of the Effective date for Amendments to the Presentation of Reclassifications of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05.  Each of these pronouncements, as applicable, has been or will be adopted by the Company.  Management does not believe the adoption of any of these accounting pronouncements had or will have a material impact on the Company's financial statements.

*O. Reclassifications*

For comparative purposes, certain prior period financial statements have been reclassified to conform with report classifications of the current year.

**2. GOING CONCERN**

The accompanying financial statements have been prepared in conformity with generally accepted accounting principles, which contemplate the continuation of the Company as a going concern.  The Company reported an accumulated deficit of $70,536,669 and had a stockholder's deficit of $2,230,401 at December 31, 2011.

In view of the matters described, there is substantial doubt as to the Company's ability to continue as a going concern without a significant infusion of capital.  At December 31, 2011, the Company had no direct operations and one license agreement for its products.  There can be no assurance that management will be successful in implementing its plans.  The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

F-11

We anticipate that we will have to raise additional capital to fund operations over the next 12 months. To the extent that we are required to raise additional funds to acquire research and growing facilities, and to cover costs of operations, we intend to do so through additional public or private offerings of debt or equity securities. There are no commitments or arrangements for other offerings in place, no guaranties that any such financings would be forthcoming, or as to the terms of any such financings. Any future financing may involve substantial dilution to existing investors. We had been relying on our common stock to pay third parties for services which has resulted in substantial dilution to existing investors.

### 3. INCOME TAXES

Deferred income taxes are reported using the liability method. Deferred tax assets are recognized for deductible temporary differences and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. Current year and accumulated deferred tax benefit at the effective Federal income tax rate of 34% is $7,128,603 (in addition to the pre-acquisition annual limitation carry-forward discussed in the following paragraph), and a valuation allowance has been set up for the full amount because of the unlikelihood that the accumulated deferred tax benefit will be realized in the future.

At December 31, 2011 and 2010, the Company had available federal and state net operating loss (NOL) carryforwards amounting to approximately $21,000,000 and $12,600,000, respectively, that are available to offset future federal and state taxable income and that expire in various periods through 2031 for federal tax purposes and 2016 for state tax purposes. No benefit has been recorded for the loss carryforwards, and utilization in future years may be limited under Sections 382 and 383 of the Internal Revenue Code if significant ownership changes have occurred or from future tax legislation changes.

The following table sets forth the significant components of the net deferred tax assets for operations in the US as of December 31, 2011 and 2010.

| Deferred tax assets: | 2011 | | 2010 | |
|---|---|---|---|---|
| NOL expense (benefit) | $ (7,128,603 ) | $ | (4,300,931) | |
| Less: valuation allowance | 7,128,603 | | 4,300,931 | |
| Net deferred tax assets | $ - | $ | - | |

A reconciliation of income tax expense at the statutory federal rate of 34% to income tax expense at the Company's effective tax rate for the years ended December 31, 2011 and 2010 is as follows:

| | 2011 | | 2010 | |
|---|---|---|---|---|
| Income tax expense (benefit) at statutory federal rate | $ (2,827,672) | 34% | $ (2,775,142) | 34% |
| State income taxes | | | | |
| NOL limitation (Note 3) | | | | |
| Increase (decrease) in valuation allowance | 2,827,672 | -34% | 2,775,142 | -34% |
| Income tax expense (benefit) at Company's effective tax rate | $ - | 0% | $ - | 0% |

F-12

### 4. EQUITY TRANSACTIONS

The Company is authorized to issue 850,000,000 shares of common stock with a par value of $.001 per share. These shares have full voting rights. There were 305,820,574 issued and outstanding as of December 31, 2011.

The Company is also authorized to issue 100,000,000 shares of common stock, Class A with a par value of $.001 per share. These shares have 10 votes per share. There were 0 issued and outstanding as of December 31, 2011.

The Company is also authorized to issue 1,000,000 shares of preferred stock. These shares have full voting rights of 1,000 votes per share. There were 999,999 issued and outstanding as of December 31, 2011.

On October 4, 2011, the Company issued 6,500,000 common shares from the Company's 2011 Stock Compensation Plan B to two consultants for services rendered with a fair market value of $156,000 based on the closing price of the Company's common stock on September 28, 2011 which was $0.024 per share.

On October 12, 2011, the Company issued 8,000,000 common shares for settlement of $8,000 of stockholder debt, for a loss on settlement of $168,000, assigned from the stockholder note payable originating on July 15, 2010 and July 30, 2010, and owing at December 31, 2010.

On October 13, 2011, the Company issued 3,000,000 common shares for settlement of $3,000 of stockholder debt, for a loss on settlement of $64,200, assigned from the stockholder note payable originating on March 2, 2011.

On October 13, 2011, the Company issued 4,500,000 common shares from the Company's 2011 Stock Compensation Plan B to a consultant for services rendered with a fair market value of $100,800 based on the closing price of the Company's common stock on October 11, 2011 which was $0.0224 per share.

On October 26, 2011, the Company issued 5,800,000 common shares for settlement of $5,800 of stockholder debt, for a loss on settlement of $165,200, assigned from the stockholder note payable originating on July 15, 2010 and August 5, 2010, and owing at December 31, 2010.

On November 4, 2011, the Company issued 30,000,000 common shares for settlement of $30,000 of stockholder debt, for a loss on settlement of $570,000, assigned from the stockholder note payable originating on August 16, 2010, September 2, 10, 14, and 17, 2010 and October 7 and 13, 2010, and owing at December 31, 2010.

On November 22, 2011, the Company issued 17,000,000 common shares for settlement of $17,000 of stockholder debt, for a loss on settlement of $323,000, assigned from the stockholder note payable originating on August 16, 2010, September 2, 10 and 14, 2010 and October 13, 2010, and owing at December 31, 2010.

On November 23, 2011, the Company issued 9,000,000 common shares for settlement of $9,000 of stockholder debt, for a loss on settlement of $171,000, assigned from the stockholder note payable originating on August 16, 2010, and owing at December 31, 2010.

On December 9, 2011, the Company issued 13,500,000 common shares for settlement of $13,500 of stockholder debt, for a loss on settlement of $256,500, assigned from the stockholder note payable originating on March 2, 2011.

On December 21, 2011, the Company issued 18,500,000 common shares for settlement of $18,500 of stockholder debt, for a loss on settlement of $166,500, assigned from the stockholder note payable originating on October 13, 2010 and May 18, 2011.

On December 28, 2011, the Company issued 5,500,000 common shares for settlement of $13,500 of stockholder debt, for a loss on settlement of $256,500, assigned from the stockholder note payable originating on March 2, 2011.

F-13

*A. Warrants*

A summary of the warrant activity for the years ended December 31, 2011 and 2010 is as follows:

| | Warrants Outstanding | Weighted Average Exercise Price |
|---|---|---|
| Outstanding, December 31, 2009 | 180,000 | $67.00 |

| | | |
|---|---|---|
| Granted | - | - |
| Forfeited / Cancelled | (180,000) | - |
| Exercised | - | - |
| Outstanding, December 31, 2010 | - | - |
| | | |
| Granted | - | - |
| Forfeited / Cancelled | - | - |
| Exercised | - | - |
| Outstanding, December 31, 2011 | - | - |

In February 2005, the Company issued a warrant to acquire up to 600,000 shares of unregistered common stock at an exercise price of $0.60 per share to W.B. International, Inc., in exchange for consulting services. All shares vested upon grant. The warrant expired in February 2010.

In June 2005, the Company issued a warrant to acquire up to 600,000 shares of unregistered common stock at an exercise price of $0.70 per share to each of Liquid Stone Manufacturing, Inc. and Stone Mountain Finishes, Inc. in consideration of certain license agreements. All shares vested upon grant. The warrants expired in June 2010.

No warrants were outstanding at December 31, 2011 and 2010. Therefore, there is no applicable weighted-average remaining contractual life to report. During the years ended December 31, 2011 and 2010 the Company has not issued any warrants.

F-14

**B. Employee Options**

On April 3, 2006, the Board of Directors of the Company authorized and approved the adoption of the 2006 Stock Option Plan effective April 3, 2006 (the "Plan"). The Plan is administered by the duly appointed compensation committee. The Plan is authorized to grant stock options of up to 2,500,000 shares of the Company's common stock. At the time a stock option is granted under the Plan, the compensation committee shall fix and determine the exercise price and vesting schedules at which such shares of common stock of the Company may be acquired. As of December 31, 2011 and 2010, no options to purchase the Company's common stock have been granted under the Plan.

In September, 2006, the Board of Directors of the Company authorized and approved the adoption of the 2006-1 Consultants and Employees Service Plan effective September 7, 2006 (the "Consultants Plan"). The Plan is administered by the duly appointed compensation committee. The Plan is authorized to grant stock options and make stock awards of up to 38,000 shares of the Company's common stock. At the time a stock option is granted under the Plan, the compensation committee shall fix and determine the exercise price and vesting schedules at which such shares of common stock of the Company may be acquired. The Consultants Plan was registered on September 15, 2006 and as of December 31, 2006 a total of 37,990 shares had been issued and granted under the Consultants Plan. During 2011 and 2010 no additional shares were issued.

**C. Equity Compensation Plans**

On January 25, 2011, the Company created a 2011 Stock Compensation Plan; authorizing the issuance of up to 15,000,000 common shares to staff or consultants for services rendered to or on behalf of the Company. The Company filed a Registration Statement on Form S-8, file no. 333-171850, to register the shares.

On September 19, 2011, the Company created a 2011 Stock Compensation Plan B; authorizing the issuance of up to 15,000,000 common shares to staff or consultants for services rendered to or on behalf of the Company. The Company filed a Registration Statement on Form S-8, file no. 333-176910, to register the shares.

There were no options outstanding at December 31, 2011.

**5. RELATED PARTY TRANSACTIONS**

On October 8, 2008, the Company entered into a line-of-credit agreement with South Beach Live, Inc. ("SBL"). During 2009, borrowings under this agreement totalled $48,469 which was settled through the issuance of common stock on November 6, 2009 (see below).

On March 25, 2009 Summitt Oil & Gas, Inc. ("SUMMITT") and 364 Melissa, Ltd. ("MELISSA") entered into a purchase and sale agreement whereas SUMMITT agreed to assign its rights with respect to debt of $814,742 plus accrued interest and to sell 400,000 shares of restricted stock for a total of $50,000. The debt comprises the Secured Convertible Note issued on January 5, 2007, in the amount of $650,000, further advances of $164,742 (total $814,742) and accrued interest of $136,346. The note is convertible into common stock at $0.01 per share. The conversion feature of the note is at the option of the note holder and therefore the Company has not accounted for any related expense.

On November 6, 2009 the debt owed to SBL and MELISSA was settled through the issuance of common stock and assignment. The loss on settlement of debt of $1,458,838 is reflected in the accompanying statement of operations. The remaining $510,000 of the convertible note was assigned from MELISSA to a stockholder of the Company.

During 2010, the stockholder sold the majority of the note payable totaling $509,991, which was converted at between $0.001 and $0.10 per share into 42,750,000 common shares by the purchasers of the debt as settlement.

The Company accrued $750,000 in management fees and bonuses to directors, officers, and a consultant for the year ended December 31, 2011 compared to $675,000 for the year ended December 31, 2010. A total of $1,425,000 remains outstanding at December 31, 2011 and as of the filing date of this Form 10-K.

Advances from related parties totaled $156,818 and $107,835 at December 31, 2011 and 2010, respectively. These advances are non-interest bearing and are due upon demand.

Advances from stockholders totaled $194,413 and $171,509 at December 31, 2011 and 2010, respectively.

The Company borrowed $193 and repaid $2,000 to an officer during the year ended December 31, 2011.

F-15

**6. COMMITMENTS AND CONTINGENCIES**

*A. Legal*

The Company is not currently aware of any formal legal proceedings or claims that the Company believes will have, individually or in the aggregate, a material adverse effect on the Company's financial position or results of operations.

*B. Operating Leases*

We currently lease office space at 6946 N Academy Blvd, Suite B #254, Colorado Springs, CO 80918 on a month to month basis.

The Company has a commitment of $50,000 in regards to the termination of its previous lease at 2422 S. Trenton Way, Unit H, Denver, CO 80231. This amount was paid as of March 2012.

*C. Liabilities*

Included in "Accrued expenses" on the balance sheet at December 31, 2011, the Company had payables totaling $35,791 to two former directors, one attorney and a consultant that were incurred in 2006 and 2005, respectively.

- The attorney represented a former related party when it was in negotiations to acquire the Company in 2005. The Company's position is that this is not its liability as it did not contract the attorney and reversed the liability based on legal opinion.

- The former directors were awarded severance agreements in June 2006 shortly before resigning from the Company. The states statute of limitations expired in June 2010 and the Company accordingly adjusted the liabilities to $0 as no demand was received.

- In February 2009, the Company filed appropriate federal tax returns for the years ending December 31, 2003 through 2007 and may be subject to failure to file penalties. From December 31, 2008 through December 31, 2010, the Company did not filed any federal tax returns. The Company estimates that the amount of penalties, if any, will not have a material effect on the results of operations, cash flows or financial position. No provisions have been made in the financial statements for such penalties, if any.

The Company entered into a license agreement with Rockbrook, Inc. on July 30, 2010. Under the agreement, the Company is entitled to an annual license fee of $25,000 for the first year, $50,000 for the second year, $75,000 for the third year, $100,000 for the fourth year and $150,000 for the fifth and successive years, in addition to royalty license fees for 50% of all revenues, receipts, monies and the fair market value of any securities directly or indirectly received by Rockbrook, Inc. as a result of and pursuant to the license agreement. As of December 31, 2011, the Company is re-assessing the license * agreement with Rockbrook and how to move forward in a cohesive arrangement with the other license agreements and acquisitions the Company is working on.

As of December 31, 2011, the Company recognized $73,702 as license revenue for fiscal 2011 and $4,166 for fiscal 2010.

F-16

---

**7. EQUIPMENT**

|  | 2011 | 2010 |
|---|---|---|
|  | $ | $ |
| Equipment | 967 | 1,567 |
| Computers | - | 614 |
|  | 967 | 2,181 |

Property and equipment are stated at cost. Maintenance and repairs are charged to expense as incurred and the cost of renewals and betterments are capitalized. Depreciation is computed using the straight-line method over the estimated lives of the related assets (5 years for equipment).

**8. INTANGIBLE ASSETS**

|  | 2011 | 2010 |
|---|---|---|
|  | $ | $ |
| Intellectual assets, primarily intellectual property | 126,000 | 126,000 |
| Less: accumulated amortization | (78,412) | (57,264) |
| Net intellectual assets | 47,588 | 68,736 |

Intangible assets are stated at fair value on the date of purchase less accumulated amortization. Amortization is computed using the straight-line method over the estimated lives of the related assets (5 years for intellectual assets). Amortization expense is expected to approximate $21,000 each year for the next two years and 5,736 in year three.

F-17

---

## 9. DISCONTINUED OPERATIONS

On October 22, 2008, the Company and South Beach Live, Inc. (SBL) entered into an Accord and Satisfaction Agreement wherein SBL agreed to release the Company from its obligation under the $250,000 Promissory Note in exchange for the Company's oil and gas lease, the Putnam M, and a surrender of any claim to the shares of Curado which were being held by SBL under a Security Agreement. SBL then exercised its right to acquire the shares of Curado thereby taking ownership of the assets and liabilities of Curado. The Company has reclassified the financial results of Curado for the period June 6, 2008 through September 30, 2008 as discontinued operations. The following table sets forth the significant components of the loss from discontinued operations:

| | | |
|---|---|---:|
| Revenue from oil and gas sales | $ | 447,412 |
| Lease operating expenses | ( | 230,164 ) |
| Other operating expenses | ( | 146,067 ) |
| Impairments | ( | 2,400,000 ) |
| Loss on disposition of subsidiary | ( | 97,050 ) |
| Loss before provision for income taxes | | (2,425,869) |
| Income tax credit | | 824,795 |
| Loss from discontinued operations | $ | (1,601,074) |

## 10. SUBSEQUENT EVENTS

On February 9, 2012, the Company established a 2012 Equity Compensation Plan that authorizes the Company to issue up to 50,000,000 common shares to staff or consultants for services to or on behalf of the Company. The Company filed a Registration Statement Form S-8 with the U.S. Securities and Exchange Commission on February 14, 2012, file no. 333-179501, to register the shares covered under the plan.

On February 24, 2012, the Company issued 3,000,000 common shares from the Company's 2012 Equity Compensation Plan to a consultant for services rendered with a deemed fair value of $246,000, or $0.082 per share based on the closing price of the Company's stock on February 23, 2012.

The aforementioned shares were registered on Form S-8 with the SEC on February 14, 2012, file no. 333-179501.

On January 13, 2012, the Company issued 1,000,000 common shares for settlement of $1,000 of stockholder debt, for a loss on settlement of $28,500, assigned from the stockholder note payable originating on June 25, 2011 and owing at December 31, 2011.

On January 20, 2012, the Company issued 46,500,000 common shares for settlement of $46,500 of stockholder debt, for a loss on settlement of $2,613,300, assigned from the stockholder notes payable originating on March 2, March 29, April 2, June 30, and July 1, 2011 and owing at December 31, 2011.

On February 9, 2012, the Company signed a license agreement with Apothecary Genetics Investments LLC. to produce several Cannabis Science Brand Formulations for the California medical cannabis market. As well, Apothecary will provide research and development facilities with full circle operations including a California laboratory facility for internal research and development, along with 16 unique genetic strains specifically generated and maintained by a cancer survivor who recognizes the importance of proper growth and breeding. In consideration of this agreement, on January 1, 2012, the Company entered into a 25 year management agreement with Dr. Mohammad Afaneh to act Chief Operating Officer of Cannabis Science, Inc. Dr. Afaneh received 28,500,000 common shares valued at $299,250 under this agreement. In addition, on February 10, 2012, Dr. Afaneh signed a management bonus agreement where he received 5,000,000 common shares valued at $185,000 as a signing bonus for entering into his management agreement. In addition, on January 1, 2012, the Company entered into a 25 year management agreement with Bret Bogue to act as Director of Horticulture and head of research and development. Mr. Bogue received 28,500,000 common shares valued at $299,250 under this agreement. In addition, on February 10, 2012, Mr. Bogue signed a management bonus agreement where he received 5,000,000 common shares valued at $185,000 as a signing bonus for entering into his management agreement.

F-18

On February 9, 2012, the Company acquired GGECO University, Inc. ("GGECO"), an online video-based medical cannabis education system, offering courses dealing with medical cannabis law, the benefits of medical marijuana, cooking, horticulture, and bud tending. Following the university's name change to Cannabis Science University, the Company hopes to use this platform to educate the general public, patients, and even those who have already been involved in the medical cannabis industry on the medical benefits of cannabis, how it is grown, how to use it safely, and the many applications or ways to administer the medication. In consideration of this agreement, the Company issued 25,000,000 common shares to the principals of GGECO, valued at $925,000.

On March 13, 2012, the Company issued 28,500,000 common shares for settlement of $28,500 of stockholder debt, for a loss on settlement of $3,262,500, assigned from the stockholder notes payable originating on August 16, 2010, September 14, 2010, September 17, 2010, October 7, 2010 and June 30, 2011 and owing at December 31, 2011.

On March 21, 2012, the Company acquired Cannabis Consulting Inc. ("CCI Group"), which consists of a group of businesses operated by Robert J. Kane, including: all contracted rights, properties, patents, trademarks, and distribution rights and agreements pertaining to Cannabis Consulting Inc., Robert Kane Partners, Kaneabis Consulting, Kaneabis Fund, Kaneabis Report, and Kaneabis Radio. In conjunction with the acquisitions, Robert Kane was promoted to V.P. of Investor Relations for the Company. Consideration paid for the CCI Group was 1,000,000 common shares to be issued to the principal, Mr. Robert Kane. He also received 250,000 free trading shares.

On March 22, 2012, the Company issued 250,000 common shares with a fair market value of $12,500 to a member of the Company's scientific advisory board for services rendered.

A stockholder of the Company, Intrinsic Capital Corp., loaned the following monies to Cannabis Science:
$20,000 on January 27, 2012
$10,000 on January 30, 2012
$51,748 on February 24, 2012
$5,000 on March 2, 2012
$25,000 on March 14, 2012
$30,000 on March 29, 2012
$15,000 on April 2, 2012
$25,000 on April 4, 2012

; for total loan proceeds of $181,748.

Subsequent events have been reviewed and included for presentation herein up to and including April 16, 2012.

Appropriate Form 8-K information will be filed after management has determined what information will be required.

F-19

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There were no disagreements with accountants on accounting and financial disclosure during the relevant period.

**ITEM 9A. CONTROLS AND PROCEDURES**

Evaluation of Disclosure Controls and Procedures

We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2009. This evaluation was accomplished under the supervision and with the participation of our chief executive officer / principal executive officer, and chief financial officer / principal financial officer who concluded that our disclosure controls and procedures are not effective to ensure that all material information required to be filed in the annual report on Form 10-K has been made known to them.

Disclosure, controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in our reports filed under the Securities Exchange Act of 1934, as amended (the "Act") is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Based upon an evaluation conducted for the period ended December 31, 2011, our Chief Executive and Chief Financial Officer as of December 31, 2011 and as of the date of this Report, has concluded that as of the end of the periods covered by this report, we have identified the following material weakness of our internal controls:

Reliance upon independent financial reporting consultants for review of critical accounting areas and disclosures and material non-standard transactions.

Lack of sufficient accounting staff which results in a lack of segregation of duties necessary for a good system of internal control.

In order to remedy our existing internal control deficiencies, as our finances allow, we will hire additional accounting staff.

Management's Annual Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes, in accordance with generally accepted accounting principles in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

12

Because of inherent limitations, a system of internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate due to change in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework at December 31, 2011. Based on its evaluation, our management concluded that, as of December 31, 2011, our internal control over financial reporting was not effective because of limited staff and a need for a full-time chief financial officer. A material weakness is a deficiency, or a combination of control deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to the attestation by the Company's registered public accounting firm pursuant to temporary rules of the SEC that permit the Company to provide only management's report in this annual report.

Changes in Internal Controls over Financial Reporting

We have not yet made any changes in our internal controls over financial reporting that occurred during the period covered by this report on Form 10-K that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

13

# PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

Identification of Directors and Executive Officers of the Company:

As of December 31, 2011, our officers and directors were as follows:

| NAME | AGE | OFFICE | SINCE |
|---|---|---|---|
| Dr. Robert Melamede | 64 | President & CEO | 2009 |
| Richard Cowan | 72 | CFO, Director and Secretary | 2009 |

The Directors named above will serve until the next annual meeting of our stockholders. Thereafter, Directors will be elected for one-year terms at the annual stockholders' meeting. Officers will hold their positions at the pleasure of the Board of Directors. There is no arrangement or understanding between the Directors and Officers of the Company and any other person pursuant to which any Director or Officer was or is to be selected as a Director or Officer of the Company.

There are no family relationships between or among any Officer and Director.

On March 30, 2009 the Company announced it acquired the assets of Cannex Therapeutics, LLC., a California based privately held company in the forefront of the development of medical cannabis based pharmaceutical products. The asset purchase agreement includes all intellectual property rights, formulas, patents, trademarks, client base, hardware and software pertaining to Cannex's pharmaceutical cannabis research & development business. Along with the Cannex asset purchase the Company appointed Steve W. Kubby as President & CEO, Richard Cowan as Director & CFO, and Robert Melamede Ph. D., as Director & Chief Science Officer.

Dr. Robert Melamede has a Ph.D. in Molecular Biology and Biochemistry from the City University of New York. Dr. Melamede retired as Chairman of the Biology Department at University of Colorado, Colorado Springs in 2005, where he continues to teach and research cannabinoids, cancer, and DNA repair. Dr. Melamede is recognized as a leading authority on the therapeutic uses of cannabis, and has authored or co-authored dozens of papers on a wide variety of scientific subjects. Dr. Melamede also serves on the Editorial Board of The Journal of the International Association for Cannabis as Medicine, the Scientific Advisory Board of Americans for Safe Access, Sensible Colorado, Scientific Advisor for Cannabis Therapeutics as well as a variety other of state dispensaries and marijuana patient advocacy groups

Mr. Richard Cowan has a Bachelor of Arts in Economics from Yale University. He has served on the board of several public companies as a specialist in mergers and acquisitions with a focus on corporate finance. Mr. Cowan is a former CEO of the National Organization for the Reform of Marijuana Laws (NORML). Mr. Cowan has broad knowledge of the medical cannabis world in USA, Canada, and Europe.

We have no audit committee. We have a compensation committee that administers our 2006 Employee Stock Option Plan that we adopted in April 2006.

14

Compliance with Section 16(a) of the Exchange Act

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors and executive officers, and persons who own more than 10% of a registered class of the Company's equity securities to file with the Securities and Exchange Commission initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Officers, directors and greater than 10% stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file.

To our knowledge, based solely on its review of the copies of such reports furnished to the company and written representations that no other reports were required during the fiscal year ended December 31, 2006, all Section 16(a) filing requirements applicable to its officers, directors and greater than 10% beneficial owners were complied with.

Code of Ethics

Code of Ethics for the Chief Executive Officer, the Principal Financial Officer, and the Chief Operating Officer.

Our Board of Directors has adopted the Code of Ethical and Professional Standards of National Healthcare Technology, Inc. and Affiliated Entities Code of Business Conduct and Ethics that applies to its officers and employees effective on April 11, 2007. We will provide any person without charge, a

copy of our code of ethics, upon receiving a written request in writing addressed to the Company at the Company's address, attention: Secretary.

**ITEM 11. EXECUTIVE COMPENSATION**

During fiscal 2011, the Company accrued a total of $750,000 in executive compensation, consisting of $0 in salary, and $750,000 in management fees. The table below shows the compensation split:

| | Cash compensation | Stock issuances | Total Compensation |
|---|---|---|---|
| Dr. Robert Melamede | $ 250,000 | $ - | $ 250,000 |
| Raymond Dabney | 250,000 | | 250,000 |
| Richard Cowan | 250,000 | - | 250,000 |
| | $ 750,000 | $ - | $ 750,000 |

15

**Employment Agreements**

Currently, the Company has management agreements with its two executives and a managing partner.

**Compensation of Directors**

Directors are entitled to reimbursement for reasonable travel and other out-of-pocket expenses incurred in connection with attendance at meeting of the Board of Directors.

We have no tabulates holdings of shares of the Company by each person who, subject to the above, at the date of this Report, holds of record or is known by Management to own beneficially more than five percent (5%) of our common stock and, in addition, by all of our directors and officers individually and as a group.

| NAME AND ADDRESS | NUMBER OF SHARES OWNED BENEFICIALLY | PERCENT OF SHARES OWNED |
|---|---|---|
| Bogat Family Trust<br>#503 - 1155 Robson St. Vancouver, BC V6E 1B5, Canada | 9,090,000 | 2.97% |
| Dr. Robert Melamede [1]<br>1918 El Parque St. Apt 4, Colorado Springs, CO 80907-6798 | 8,507,000 | 2.78% |
| Richard Cowan [1]<br>Haarlemmerstraat 86, Amsterdam, Netherlands 1013EV | 8,507,000 | 2.78% |
| ALL DIRECTORS AND<br>EXECUTIVE OFFICERS | 17,014,000 | 8.35% |

[1] Officer and Director.

**Changes in Control**

There are no arrangements known by us, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change of control of the Company.

16

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

During the year the following transactions occurred between the Company and certain related parties:

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

(1) AUDIT FEES
The aggregate fees billed for professional services rendered by our auditors, for the audit of the registrant's annual financial statements and review of the financial statements included in the registrant's Form 10-K or services that are normally provided by the accountant in connection with statutory and regulatory filings or engagements for fiscal year 2011 was $_____ and in 2010 was $51,500.

(2) AUDIT-RELATED FEES
The aggregate fees billed for professional services rendered by our auditor include amounts paid for the review of the unaudited financial statements included in the registrant's Form 10-Q were approximately $_____.

(3) TAX FEES
NONE

(4) ALL OTHER FEES
NONE

(5) AUDIT COMMITTEE POLICIES AND PROCEDURES
Audit Committee Financial Expert

The Securities and Exchange Commission has adopted rules implementing Section 407 of the Sarbanes-Oxley Act of 2002 requiring public companies to disclose information about "audit committee financial experts." As of the date of this Annual report, we do not have a standing Audit Committee. The functions of the Audit Committee are currently assumed by our Board of Directors. Additionally, we do

not have a member of our Board of Directors that qualifies as an "audit committee financial expert." For that reason, we do not have an audit committee financial expert.

(6) If greater than 50 percent, disclose the percentage of hours expended on the principal accountant's engagement to audit the registrant's financial statements for the most recent fiscal year that were attributed to work performed by persons other than the principal accountant's full-time, permanent employees.

Not applicable.

17

---

# PART IV

**ITEM 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a) Exhibits filed with report:

31.1 Certification of the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, filed herewith.
31.2 Certification of the Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, filed herewith.
32.1 Certification of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, filed herewith.
32.2 Certification of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, filed herewith.

99.1 Pro Forma Combined Financial Statements for GGECO University, Inc.

| | |
|---|---|
| EX-101.INS | XBRL INSTANCE DOCUMENT |
| EX-101.SCH | XBRL TAXONOMY EXTENSION SCHEMA |
| EX-101.CAL | XBRL TAXONOMY EXTENSION CALCULATION LINKBASE |
| EX-101.LAB | XBRL TAXONOMY EXTENSION LABEL LINKBASE |
| EX-101.PRE | XBRL TAXONOMY EXTENSION PRESENTATION LINKBASE |
| EX-101.DEF | XBRL TAXONOMY EXTENSION DEFINITION LINKBASE |

18

---

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Exchange Act, the Registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

**Cannabis Science, Inc.**

Date: April 16, 2012

By: /s/ Dr. Robert Melamede

Dr. Robert Melamede President, Chief Executive Officer Director

Pursuant to the requirements of the Exchange Act this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ Dr. Robert Melamede<br>Dr. Robert Melamede | President, Chief Executive Officer, Director | April 16, 2012 |
| /s/ Richard Cowan<br>Richard Cowan | Chief Financial Officer Director | April 16, 2012 |

# EXHIBIT #5



| Home | News Viewer | Markets | Investing | Personal Finance | Industries | Economy/Politics | Trading Deck | Job |

| Stocks | Mutual Funds | ETFs | Options | Bonds | Commodities | Currencies | Getting Started | MarketWatch Adviser | Premi |

**Latest News** — View All — **Alerts**

6:50p Carlyle prices IPO below range at $22: WSJ
6:40p Green Mountain Coffee shares off 40% after hours
6:32p Carlyle Group prices IPO below expected range: WSJ
6:32p BREAKING

May 2, 2012                   7:03 PM EDT

| New York | London | Tokyo | DOW | -10.75 | NASDAQ | +9.41 | S&P 500 | -3.51 |
| After | Closed | Holiday | 13,268.57 | -0.08% | 3,059.85 | +0.31% | 1,402.31 | -0.25% |

  

# Cannabis Science Inc.

OBB: CBIS

Set Alerts

Add to Portfolio

| OVERVIEW | PROFILE | NEWS | CHARTS | FINANCIALS [NEW] | HISTORICAL QUOTES | ANALYST ESTIMATES | OPTIONS | SEC |

After Hours

## $0.09

| Change | 0.00 0.00% |
| Volume | 6.15m |

May 2, 2012, 4:01 p.m.
Quotes are delayed by 20 min

| Today's close | $ 0.09 |
| Change | -0.0045 -4.59% |

| Day low | Day high |
| $0.09 | $0.10 |

Open: 0.10

| 52 week low | 52 week high |
| $0.0085 | $0.25 |

| Market cap | $37.80M |
| Average volume | 24.54M |
| P/E ratio | N/A |
| Rev. per Employee | $36,851 |
| EPS | N/A |
| Dividend | N/A |
| Div yield | N/A |

Compare: Indexes          Add          MarketW

No News curr



| 1d | 5d | 3m | 6m | 1y | 3y | 5y | | Set |

## Other News on CBIS

**10-K: CANNABIS SCIENCE, INC.**
4:23 p.m. April 16, 2012 - Edgar Online - (EDG = 10Q, 10K)

**Marijuana: A Half-Baked Investment Idea?**
4:23 p.m. Nov. 1, 2010 - SmartMoney

| Ex dividend date | **N/A** | | | | | | | |
| **Home** | **News Viewer** | **Markets** | **Investing** | **Personal Finance** | **Industries** | **Economy/Politics** | **Trading Deck** | **Jot** |

| **Stocks** | Mutual Funds | ETFs | Options | Bonds | Commodities | Currencies | Getting Started | MarketWatch Adviser | Premi |

## From Ar

**4 risky places**
Bankrate.com

**10 Worst-Rate**
AARP.org

**Buffett Just Bc**
StreetAuthority

**Why You Sho**
Daily Finance

**Never Trade V**
DailyFX

## Press Re

**Cannabis Scie**
Time medical
Canyon Reso
8:44 a.m. April 30

**Cannabis Scie**
of Products In
2:45 p.m. April 24

**Cannabis Scie**
and Licensing
License to Ma
for Advertising
12:10 p.m. April 2

**The Universe**

---

**MarketWatch.com**

| Enter Symbols or Keywords | | SEARCH |

| Site Index | Company Info | MarketWatch on Facebook | WSJ.com |
| Topics | Code of Conduct | | Barron's Onlin |

| Help | Corrections | MarketWatch on Twitter | BigCharts |
| Home   News Viewer   Markets | Investing   Personal Finance | Industries   Economy/Politics | Trading Deck   Job |
| Feedback | Advertising Media Kit | | Virtual Stock E |
| Stocks   Mutual Funds   ETFs   Options   Bonds   Commodities   Currencies | Newsroom   License our Content | Getting Started   MarketWatch Ad | RSS   MarketWatch Advertising Local |
| Media Archive | License our Content | Podcasts | |
| Premium Products | Broker Center | | |
| Mobile | Your Ad Choices | | |

Copyright © 2012 Ma
By using this site, yo
10/18/2011.

Intraday Data provided by SIX Telekurs and subject to terms of use. Historical and current end-of-day data provided by SIX Telekurs. Intraday data delayed per exchange requirements. Dow Jones Indexes (SM) from Dow Jones & Company, Inc. All quotes are in local exchange time. Real time last sale data provided by NASDAQ. More information on NASDAQ traded symbols and their current financial status. Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. Dow Jones IndexesSM from Dow Jones & Company, Inc. SEHK intraday data is provided by SIX Telekurs and is at least 60-minutes delayed. All quotes are in local exchange time.